STATE OF NEBRASKA, APPELLANT, V.
MATTHEW R. RHEA, APPELLEE.
636 N.W.2d 364
Filed December 7, 2001.   No. S-01-145.

L. Kenneth Polikov, Sarpy County Attorney, and John E. Higgins for appellant.

Michael N. Schirber, of Schirber Law Offices, P.C., for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, and MILLER-LERMAN, JJ.

STEPHAN, J.

This is an error proceeding brought pursuant to Neb. Rev. Stat. § 29-2315.01 (Reissue 1995). The State, through the Sarpy County Attorney, takes exception to an order of the district court for Sarpy County sustaining a plea in abatement filed on behalf of Matthew R. Rhea and dismissing all criminal charges against him. We removed the matter to our docket on our own motion pursuant to our authority to regulate the dockets of the appellate courts of this state. See Neb. Rev. Stat. § 24-1106(3) (Reissue 1995). Rhea waived his right to file a brief and has not participated in the appellate proceedings. We conclude that the district court erred, and because jeopardy has not attached, we remand for further proceedings.

## BACKGROUND

The evidence offered with respect to Rhea's plea in abatement discloses the following facts: Rhea, Andrew J. Hawkins, and Alvaro Castillo III met in an advanced computer class at the high school they attended in Papillion, Nebraska. In late summer 1999, they devised a plan whereby Rhea, who worked as a mail sorter at First Data Resources (FDR) in Omaha, would take credit card billing statements from FDR and sell them to Hawkins and Castillo. Hawkins and Castillo would then use these billing statements, which contained the names, addresses, and credit card account numbers of numerous individuals, to order merchandise using the Internet.

In early August 1999, Rhea took 40 to 50 billing statements from FDR and sold them to Castillo for $100 cash. Castillo then gave the billing statements to Hawkins, who entered the information into his personal computer and then destroyed the statements. Hawkins then sent encrypted e-mails containing the same information back to Castillo.

Over the next several months, Castillo used the credit card account numbers to make approximately 50 purchases using the Internet. Hawkins used the same information to make 10 to 15 purchases. As part of the process, Castillo and Hawkins had the merchandise shipped to various vacant houses located in Papillion and LaVista, Nebraska. If delivery of the package did not require a signature, the package was simply left on the

doorstep of the vacant house, where Castillo or Hawkins would later pick it up.

In the course of retrieving these packages, Castillo and Hawkins aroused the suspicion of the neighbors living near the vacant houses which Castillo and Hawkins used as "drops." These persons reported the suspicious activity to the Papillion Police Department, who assigned the case to Investigator Jim Murcek.

On December 2, 1999, Murcek observed a young man park a vehicle in front of one of the vacant houses and retrieve a package from the doorstep. Murcek then followed the vehicle to a Papillion residence, where he made contact with the driver, who was subsequently identified as Castillo. After being advised of his rights, Castillo made a voluntary statement confessing to his participation in the plan and implicating both Rhea and Hawkins. Castillo and his parents then consented to a search of their home which yielded numerous electronic devices that Castillo had ordered utilizing the credit account numbers supplied by Rhea.

Murcek accompanied Castillo to Hawkins' home and then to Rhea's home. After being advised of their rights, both Rhea and Hawkins confessed to their participation in the plan. A search of Hawkins' bedroom uncovered numerous electronic devices which he had purchased using the account numbers on the statements which Rhea took from FDR. A search of Rhea's home produced nothing, but Murcek found 174 additional billing statements under the rear passenger-side floorboard of Rhea's vehicle.

The record reflects that Castillo and Hawkins used the account numbers supplied by Rhea to place electronic orders for merchandise totaling $121,000 in value, of which $3,865 remains unreturned or unrecovered. Rhea denied using the account numbers to order merchandise but admitted that on four or five occasions, he attempted to pick up packages which had been ordered by Hawkins or Castillo and delivered to vacant houses.

On September 8, 2000, Rhea was charged with criminal possession of a financial transaction device, unlawful circulation of a financial transaction device, and conspiracy to commit theft in violation of Neb. Rev. Stat. §§ 28-621, 28-622, and 28-202(1) (Reissue 1995), respectively. On October 26, Rhea filed an amended plea in abatement requesting dismissal of all charges filed against him. The district court dismissed the conspiracy

charge for reasons unrelated to this error proceeding. After conducting an evidentiary hearing, the district court sustained Rhea's plea in abatement and dismissed all remaining charges against him.

The district court explained the reasons for its ruling in a written opinion and order. First, the court held that the billing statements Rhea obtained did not constitute "financial transaction devices" within the definition of that term provided in Neb. Rev. Stat. § 28-618(7) (Reissue 1995). Specifically, the district court reasoned that the terms "instrument" and "device" in § 28-618(7) referred to "tangible bank or credit card[s]" and not account numbers on a billing statement. Second, the district court held that in any event, Rhea and Hawkins could not be convicted under §§ 28-621 and 28-622 because § 28-618(7) "requires the device to 'affect' an account," which the district court interpreted as making the possession and circulation unlawful "only when the device is actually used." Finally, noting that §§ 28-621 and 28-622 require a financial transaction device to be, inter alia, "stolen" to constitute a crime, the district court held that although Rhea may have taken the billing statements in violation of FDR's policies, "the information was not actually 'stolen' or in any way taken from the cardholders [because] they still own[ed] and possess[ed] their own credit cards and the ability to utilize them."

## STANDARD OF REVIEW

Interpretation of a statute presents a question of law, in connection with which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *State v. Spurgin*, 261 Neb. 427, 623 N.W.2d 644 (2001).

## ASSIGNMENTS OF ERROR

The State assigns as error, rephrased, (1) the district court's conclusion that credit card numbers on a billing statement do not constitute a "financial transaction device" under § 28-618(7), (2) the district court's conclusion that the word "affect" in § 28-618(7) requires a financial transaction device to be used before an individual can be charged with criminal possession or unlawful circulation of such devices under §§ 28-621 and 28-622, and (3) the district court's determination that the billing

statements were not "stolen" within the meaning of §§ 28-621 and 28-622.

## ANALYSIS

### APPLICABLE STATUTES

We are asked in this error proceeding to review the district court's interpretation of the penal statutes under which Rhea was charged, as well as other related statutes. In count I of the information, Rhea was charged with criminal possession of a financial transaction device in violation of § 28-621, which provides:

> (1) A person commits the offense of criminal possession of a financial transaction device if, with the intent to defraud, such person has in his or her possession or under his or her control any financial transaction device issued to a different account holder or which he or she knows or reasonably should know to be lost, stolen, forged, altered, or counterfeited.

> (2) Any person committing the offense of criminal possession of one financial transaction device shall be guilty of a Class III misdemeanor.

> (3) Any person committing the offense of criminal possession of two or three financial transaction devices, each issued to different account holders, shall be guilty of a Class IV felony.

> (4) Any person committing the offense of criminal possession of four or more financial transaction devices, each issued to different account holders, shall be guilty of a Class III felony.

Rhea was specifically charged with a violation of § 28-621(4). In count II, Rhea was charged with unlawful circulation of a financial transaction device in violation of § 28-622, which provides:

> (1) A person commits the offense of unlawful circulation of a financial transaction device in the first degree if such person sells or has in his or her possession or under his or her control with the intent to deliver, circulate, or sell two or more financial transaction devices which he or she knows or reasonably should know to be lost, stolen, forged, altered, counterfeited, or delivered under a mistake as to the identity or address of the account holder.

(2) Any person committing the offense of unlawful circulation of a financial transaction device in the first degree shall be guilty of a Class III felony.

The term "financial transaction device" as used in these statutes is defined by § 28-618(7) as

any instrument or device whether known as a credit card, credit plate, bank service card, banking card, check guarantee card, debit card, electronic funds transfer card, *or account number representing a financial account.* Such device shall affect the financial interest, standing, or obligation of the financial account for services or financial payments for money, credit, property, or services.

(Emphasis supplied.)

### FINANCIAL TRANSACTION DEVICE

■ In order to resist a challenge by a plea in abatement, the evidence received by the committing magistrate need show only that a crime was committed and that there is probable cause to believe that the accused committed it. The evidence need not be sufficient to sustain a verdict of guilty beyond a reasonable doubt. *State v. Bottolfson*, 259 Neb. 470, 610 N.W.2d 378 (2000).

■ The State's first assignment of error requires us to determine whether credit card account numbers included on the billing statements taken from the premises of FDR constitute a "financial transaction device" as defined by § 28-618(7). In making this determination, we consider the language of the statute in conjunction with the familiar principle that if the language of a statute is clear, the words of such statute are the end of any judicial inquiry. *In re Guardianship & Conservatorship of Garcia*, ante p. 205, 631 N.W.2d 464 (2001); *Mulinix v. Roberts*, 261 Neb. 800, 626 N.W.2d 220 (2001).

■ We respectfully disagree with the reasoning of the district court that the terms "instrument" and "device" in § 28-618(7) refer exclusively to such items as "tangible bank or credit card[s]" and not to account numbers on billing statements. This construction ignores the plain language of the statute which includes an "account number representing a financial account" within the definition of a "financial transaction device." § 28-618(7). If it can be avoided, no word, clause, or sentence of a statute should be

rejected as superfluous or meaningless. *Hatcher v. Bellevue Vol. Fire Dept., ante* p. 23, 628 N.W.2d 685 (2001); *City of Lincoln v. Nebraska Liquor Control Comm.*, 261 Neb. 783, 626 N.W.2d 518 (2001). Here, it is clear that the Legislature intended to include both tangible items such as credit cards *and* the account numbers reflected on such cards within the definition of a financial transaction device.

We note that even under statutes less explicit than ours, other state courts have held that the wrongful use of a credit card *number* is the equivalent of wrongfully using the credit card itself. See, *State v. Morgan*, 985 P.2d 1022 (Alaska App. 1999); *State v. Shea*, 221 Wis. 2d 418, 585 N.W.2d 662 (Wis. App. 1998); *Patterson v. State*, 326 Ark. 1004, 935 S.W.2d 266 (1996); *State v. Howard*, 221 Kan. 51, 557 P.2d 1280 (1976). The reasoning of the Alaska Court of Appeals in *State v. Morgan*, 985 P.2d at 1023, is typical and instructive:

> Policy considerations and case law support the conclusion that a credit card number is included in the definition of "credit card." As the Arkansas Supreme Court recognized in *Patterson v. State*, "[i]t is the use of the account numbers on a credit card which gives the plastic card any credit value." Most people are aware that once they memorize the number on their plastic credit card, they no longer need the plastic card to make long-distance telephone calls *or to purchase other goods or services over the telephone or across the Internet.* In these transactions, merchants and buyers do not meet face-to-face, and merchants do not demand proof that the buyer is holding a plastic card. Rather, the buyer's knowledge of the credit card number is what allows the buyer to make these purchases on credit. Physical possession of the plastic card is unnecessary, for the value of the card resides in the number.

(Emphasis supplied.) We conclude that the district court erred in holding that the credit card account numbers on the statements Rhea took from FDR did not constitute financial transaction devices as defined by § 28-618(7).

## MEANING OF "AFFECT"

In its second assignment of error, the State contends that the district court erred in its interpretation of the word "affect" in

the second sentence of § 28-618(7). In its order, the district court held that "since the definition [of financial transaction device] requires the device to 'affect' an account, the plain meaning of the wording may make the possession or circulation unlawful only when the device is actually used." In other words, the district court interpreted the word "affect" in § 28-618(7) to mean "use" and then concluded that Rhea could not have criminally possessed or circulated financial transaction devices, since the possession and circulation of such devices does not involve their use.

The components of a series or collection of statutes pertaining to a certain subject matter may be conjunctively considered and construed to determine the intent of the Legislature so that different provisions of the act are consistent, harmonious, and sensible. *In re Estate of Eickmeyer, ante* p. 17, 628 N.W.2d 246 (2001); *In re Estate of Sutherlin*, 261 Neb. 297, 622 N.W.2d 657 (2001). The unauthorized *use* of a financial transaction device is proscribed by Neb. Rev. Stat. § 28-620 (Reissue 1995). Criminal *possession* of a financial transaction device is proscribed by § 28-621, and the unlawful *circulation* of a financial transaction device is proscribed by § 28-622. The phrase "shall affect the financial interest, standing, or obligation of [a] financial account" in § 28-618(7) is part of the definition of "financial transaction device," and that definition applies to all of the aforementioned penal statutes. The construction given to § 28-618(7) by the district court, which requires actual use in order to meet the definition of a "financial transaction device," would render the unlawful-use proscription of § 28-620 redundant and would be inconsistent with §§ 28-621(1) and 28-622(1), which criminalize possession and circulation of lost, stolen, forged, altered, or counterfeited financial transaction devices under certain circumstances without requiring their actual use. Based upon our independent review, we conclude that the final sentence of § 28-618(7) requires that for purposes of Neb. Rev. Stat. §§ 28-618 to 28-630 (Reissue 1995 & Cum. Supp. 2000), a "financial transaction device" must be something which is capable of being used to execute a transaction in a financial account. In the instant case, there is evidence that the account numbers reflected on the statements which Rhea removed from the

premises of FDR could be and in fact were used to purchase merchandise which was billed to such accounts.

## MEANING OF "STOLEN"

In its third assignment of error, the State contends that the district court erroneously interpreted the word "stolen" in §§ 28-621 and 28-622 when it stated:

> It would not appear that the statements in question come under the umbrella of 'lost, stolen, forged, altered, counterfeited, or delivered under a mistake,' considering the fact that the information was obtained through the course of Defendant's employment at First Data Resources, albeit in violation of FDR's policies and without their permission. The strongest argument would be that the 'device' was 'stolen,' but the information was not actually 'stolen' or in any way taken from the cardholders, whereas they still own and possess their own credit cards and the ability to utilize them. They were not deprived of property as the term 'stolen' typically connotes.

The term "steal" means "[t]o take (personal property) illegally with the intent to keep it unlawfully" or "[t]o take (something) by larceny, embezzlement, or false pretenses." Black's Law Dictionary 1425 (7th ed. 1999). Acting without authorization and with the knowledge that they would be used unlawfully, Rhea physically removed the statements containing the credit account numbers from his employer's premises. As noted, the account numbers reflected on the statements constituted financial transaction devices as defined by § 28-618(7), and on these facts, we have no difficulty in concluding from the record that there was competent evidence upon which a trier of fact could conclude that they were stolen.

## DOUBLE JEOPARDY

For the reasons above, we find merit in the State's exceptions to the district court's ruling on Rhea's amended plea in abatement. Disposition of the case is therefore governed by Neb. Rev. Stat. § 29-2316 (Reissue 1995), which provides:

> The judgment of the court in any action taken pursuant to section 29-2315.01 shall not be reversed nor in any manner affected when the defendant in the trial court has been

placed legally in jeopardy, but in such cases the decision of the appellate court shall determine the law to govern in any similar case which may be pending at the time the decision is rendered or which may thereafter arise in the state. When the decision of the appellate court establishes that the final order of the trial court was erroneous and the defendant had not been placed legally in jeopardy prior to the entry of such erroneous order, the trial court may upon application of the county attorney issue its warrant for the rearrest of the defendant and the cause against him or her shall thereupon proceed in accordance with the law as determined by the decision of the appellate court.

The Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution and of article I, § 12, of the Nebraska Constitution protects an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense. *State v. Bottolfson*, 259 Neb. 470, 610 N.W.2d 378 (2000); *State v. Bostwick*, 222 Neb. 631, 385 N.W.2d 906 (1986). Under Neb. Const. art. I, § 12, jeopardy attaches when a judge, hearing a case without a jury, begins to hear evidence as to the guilt or innocence of the defendant. *State v. Bottolfson, supra*; *State v. Franco*, 257 Neb. 15, 594 N.W.2d 633 (1999). In a case tried to a jury, jeopardy attaches when the jury is empaneled and sworn. *State v. Bottolfson, supra*; *State v. Bostwick, supra*.

The record in this case reflects that no jury was empaneled and that no evidence was heard by the district court pertaining to Rhea's guilt or innocence on the charges on which he stood accused. The focus of the district court's inquiry with respect to the amended plea in abatement was whether the charged offenses had been committed and whether there was probable cause to believe that Rhea committed them. See *State v. Bottolfson, supra*. Accordingly, we conclude that jeopardy has not attached.

## CONCLUSION

Based upon our independent review of the pertinent penal statutes and the record in this case, we conclude that the district court erred in sustaining Rhea's plea in abatement and in dismissing the charges which were the subject thereof. Accordingly, the State's exception is sustained, and because

jeopardy did not attach, the cause is remanded to the district court for further proceedings pursuant to § 29-2316.

EXCEPTION SUSTAINED, AND CAUSE REMANDED FOR FURTHER PROCEEDINGS.

MCCORMACK, J., participating on briefs.