STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLANT, V. JOHN L. LOTTER, APPELLANT AND CROSS-APPELLEE.
669 N.W.2d 438

Filed September 26, 2003.    Nos. S-02-1072 through S-02-1074.

James R. Mowbray and Jerry L. Soucie, of Nebraska Commission on Public Advocacy, for appellant.

Jon Bruning, Attorney General, and Marie Colleen Clarke for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.
## I. NATURE OF CASE
John L. Lotter appeals from an order of the district court for Richardson County which overruled his amended motion for DNA testing pursuant to the DNA Testing Act, Neb. Rev. Stat. § 29-4116 et seq. (Cum. Supp. 2002).

## II. SCOPE OF REVIEW
A motion for DNA testing is similar to a motion for new trial based on newly discovered evidence. Therefore, a motion for DNA testing is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. See *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000).

Interpretation of a statute presents a question of law, in connection with which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *Johnson v. Kenney*, 265 Neb. 47, 654 N.W.2d 191 (2002).

In an appeal from a proceeding under the DNA Testing Act, the trial court's findings of fact will be upheld unless such findings are clearly erroneous. *State v. Poe, ante* p. 437, 665 N.W.2d 654 (2003).

## III. FACTS
### 1. BACKGROUND
Lotter was convicted of three counts of first degree murder, three counts of use of a weapon to commit a felony, and one count of burglary. He was sentenced to death for each count of first degree murder and to incarceration on the burglary and use of a weapon convictions. We vacated the sentence on the burglary

conviction but affirmed the convictions and sentences on all other charges in *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), *modified on denial of rehearing* 255 Neb. 889, 587 N.W.2d 673 (1999). A thorough recitation of the facts in the underlying case is set forth in that opinion. In *State v. Lotter, ante* p. 245, 664 N.W.2d 892 (2003), we affirmed the district court's denial of Lotter's motions for postconviction relief, new trial, and writ of error coram nobis.

## 2. CASE AT BAR

On December 20, 2001, Lotter filed a pro se motion for DNA testing pursuant to the DNA Testing Act. At the direction of the district court, the State filed an inventory listing several items containing biological evidence. In response to a motion for summary dismissal filed by the State, counsel for Lotter filed an amended motion for DNA testing. The State's motion for summary dismissal was overruled, and Lotter was granted a hearing on his amended motion.

In Lotter's amended motion for DNA testing, he alleged that he intended to utilize the "PowerPlex 16" amplification and multiplex identification system with the "ABI Prism 310 Genetic Analyzer" to test items containing biological evidence, including a pair of yellow work gloves; cuttings taken from the gloves; shoes and clothing of his accomplice, Thomas M. Nissen, also known as Marvin T. Nissen; and known comparison blood samples from the murder victims, Teena Brandon, Lisa Lambert, and Phillip DeVine. Lotter alleged that evidence of high-velocity blood spatter from Brandon or the presence of DNA from Lambert and/or DeVine on Nissen's gloves, shoes, or clothing would establish that Nissen was not in the locations that he described in his trial testimony. Lotter further alleged that DNA tests would establish that Nissen lied during his testimony and that Nissen, not Lotter, was holding the gun at the time all three victims were murdered.

Evidence at Lotter's trial indicated that the yellow work gloves worn by Nissen at the time of the crime contained two areas that tested positive for blood. The serologist did not conduct additional tests because further testing would have consumed the sample and the serologist had been instructed by defense counsel to preserve the evidence for independent analysis.

Prior to the hearing on Lotter's amended motion for DNA testing, he filed an application for writ of habeas corpus ad prosequendum, requesting that he be allowed to attend the hearing. The district court denied the application, and the hearing proceeded in Lotter's absence.

At the hearing on his amended motion for DNA testing, Lotter submitted the affidavit of Ronald Rubocki, Ph.D., and portions of the trial record relevant to his motion. The State submitted the affidavit of Charlotte Word, Ph.D., and the bill of exceptions from Lotter's trial and postconviction proceedings. The district court denied Lotter's amended motion for DNA testing, concluding that such testing would not result in noncumulative, exculpatory evidence relevant to any claim that Lotter was wrongfully convicted or sentenced.

Lotter timely appealed, and the district court granted his motion to proceed in forma pauperis on appeal to this court.

## IV. ASSIGNMENTS OF ERROR

Lotter assigns that the district court erred (1) in refusing to allow DNA testing of evidence in the possession of the State, as required by the DNA Testing Act, and (2) in refusing to allow Lotter to attend the hearing on his amended motion for DNA testing, in violation of the Due Process Clause of the 14th Amendment to the U.S. Constitution.

On cross-appeal, the State assigns, restated, that the district court erred in its conclusions of law and fact pertaining to whether DNA testing was "effectively not available at the time of trial." See § 29-4120(5).

## V. ANALYSIS

### 1. DNA Testing Act

Section 29-4120, which sets forth the procedure for obtaining postconviction DNA testing, provides in relevant part:

(1) Notwithstanding any other provision of law, a person in custody pursuant to the judgment of a court may, at any time after conviction, file a motion, with or without supporting affidavits, in the court that entered the judgment requesting forensic DNA testing of any biological material that:

(a) Is related to the investigation or prosecution that resulted in such judgment;

(b) Is in the actual or constructive possession or control of the state or is in the possession or control of others under circumstances likely to safeguard the integrity of the biological material's original physical composition; and

(c) Was not previously subjected to DNA testing or can be subjected to retesting with more current DNA techniques that provide a reasonable likelihood of more accurate and probative results.

. . . .

(5) Upon consideration of affidavits or after a hearing, the court shall order DNA testing pursuant to a motion filed under subsection (1) of this section upon a determination that such testing was effectively not available at the time of trial, that the biological material has been retained under circumstances likely to safeguard the integrity of its original physical composition, and that such testing may produce noncumulative, exculpatory evidence relevant to the claim that the person was wrongfully convicted or sentenced.

Section 29-4119 defines exculpatory evidence as "evidence which is favorable to the person in custody and material to the issue of the guilt of the person in custody."

## 2. Denial of Request for DNA Testing

Lotter assigns as error that the district court should have allowed DNA testing of evidence in possession of the State. In the case at bar, the issue to be determined is whether DNA testing requested by Lotter in his amended motion "may produce noncumulative, exculpatory evidence relevant to [his] claim that [he] was wrongfully convicted or sentenced." See § 29-4120(5).

We will first examine the arguments made by Lotter and the State and the district court's order. We will then analyze whether the DNA testing requested by Lotter would affect his convictions or sentences.

### (a) Lotter's Argument

Lotter claims that the requested DNA testing may produce noncumulative, exculpatory evidence in his favor. He argues that the district court was simply wrong in its interpretation of what

is required before DNA testing must be ordered. He asserts that under the court's logic, a videotape of Nissen shooting all three victims would likewise fail to change Lotter's guilty verdicts or death sentences.

Lotter also argues that favorable DNA evidence may support the theory that he was innocent of all three murders. He contends that because there was only circumstantial evidence placing him with Nissen hours before the shootings and with Nissen after the murders, the only evidence that Lotter caused harm to anyone came from Nissen's testimony. Lotter claims that blood spatter from the victims on Nissen's gloves, shoes, or clothing would establish that Nissen was very close to the victims when they were shot and that Nissen was not at the locations he described in his trial testimony. Lotter asserts that such DNA test results would aid in establishing that Nissen lied at trial and would prove that Nissen shot all three victims.

Lotter further argues that favorable DNA evidence may support the admissibility of Nissen's admissions to Jeff Haley, which were excluded as evidence at Lotter's postconviction hearing, by providing additional circumstantial guarantees of trustworthiness. Haley testified via deposition that he was Nissen's cellmate at the Lincoln Correctional Center in 1997. Nissen was reading a book at that time about the Brandon murder and was upset because he felt it contained lies. According to Haley, Nissen showed him the autopsy photographs of the victims and explained and demonstrated in detail how he shot and killed all three victims. Nissen told Haley that while Nissen was shooting the victims, Lotter was "freaking out and running around," saying, "What are you doing? What are you doing?" According to Haley, Nissen stated that he should have shot Lotter as well, and then there would have been no witnesses. Lotter contends that DNA evidence of the victims' blood on the gloves, shoes, or clothing worn by Nissen would enhance the trustworthiness of Nissen's alleged statements.

We note that on Lotter's postconviction appeal, we concluded that the district court did not err in determining that these statements were inadmissible under Neb. Rev. Stat. § 27-804(2)(c) (Reissue 1995) "[b]ecause there [were] no circumstances which 'clearly indicate[d] the trustworthiness' of Nissen's statements

to Haley." See *State v. Lotter, ante* p. 245, 266, 664 N.W.2d 892, 911-12 (2003).

Lotter also argues that favorable DNA evidence may exclude him from being "death eligible." He asserts that the district court failed to recognize the importance of determining who the shooter was when the death penalty is at issue. Lotter contends that under the 8th and 14th Amendments to the U.S. Constitution, there must be a finding that the defendant killed, attempted to kill, or intended that a killing take place or a finding that the defendant was a major participant in the felony and exhibited reckless indifference to human life. See, *Tison v. Arizona*, 481 U.S. 137, 107 S. Ct. 1676, 95 L. Ed. 2d 127 (1987); *Enmund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982). Lotter argues that if the sentencing panel or jury had DNA test results indicating that one or more of the victims' blood was on Nissen's gloves, shoes, or clothing, then it would not have decided beyond a reasonable doubt that Lotter shot all three victims. Lotter asserts that without a finding that he shot all three victims, he could not have been sentenced to death.

Lotter next asserts that favorable DNA evidence may preclude the application of aggravating circumstance (1)(e) to his case. See Neb. Rev. Stat. § 29-2523 (Reissue 1995) (version of law in effect at time of Lotter's sentencing). He contends that the plain language of aggravating circumstance (1)(e) is only applicable when a defendant was the "actual 'triggerman.' " See brief for appellant at 27. He asserts that aggravating circumstance (1)(e) does not allow for its application to one found guilty as an accomplice or one who aided and abetted a felony murder.

Lotter also argues that favorable DNA evidence may exclude the application of aggravating circumstances (1)(b) and (1)(h). He argues that these aggravating circumstances can be applied only if the evidence establishes that Lotter was the shooter. He contends that the determination by the sentencing panel that these aggravating circumstances applied to Lotter was based solely on Nissen's testimony.

Finally, Lotter argues that the district court should not, and indeed cannot, under the terms of the DNA Testing Act, prejudge how exculpatory or mitigating results may theoretically be applied to a case before the results are known. He asserts that

only after obtaining the results will the court be confronted with the question of whether the results are sufficient to warrant vacating the convictions, vacating the sentences, granting a new trial, or granting a new sentencing hearing.

## (b) State's Argument

The State argues that DNA evidence would not establish that Lotter was wrongfully convicted. The State first points out that Lotter was charged on three theories of first degree murder: premeditated murder, felony murder, and aiding and abetting. It asserts that the evidence was overwhelming that Lotter and Nissen shared the motive to silence Brandon, who had accused the two of sexually assaulting her. It also asserts the evidence showed that Lotter and Nissen planned Brandon's murder together and that together they murdered her and two witnesses to her murder.

The State argues that the evidence demonstrating these assertions includes, but is not limited to, testimony regarding (1) Lotter's theft of the gun used to murder the victims that same evening; (2) Lotter's successful efforts to obtain gloves from his family home, as well as a knife (with "Lotter" printed on the sheath) used by Nissen to stab Brandon; (3) the appearance of Lotter and Nissen together just prior to the murders at the home of Linda Gutierres, where both were seen wearing gloves; (4) statements attributed to Lotter by witnesses the evening of the murders, including a statement regarding his desire to kill someone; (5) the appearance of Lotter and Nissen together after the murders seeking alibi assistance from Rhonda McKenzie and Kandi Nissen (Kandi); and (6) observations by McKenzie and Kandi about a series of private discussions between Lotter and Nissen in Nissen's home the week preceding the murders.

The State also argues that Lotter is mistaken to presume that if blood from any of the victims is on the gloves, shoes, or clothing confiscated from Nissen, then somehow this would establish that Nissen, not Lotter, was the shooter. It argues that Lotter incorrectly assumes that only the shooter could possibly have blood from the victims on his gloves, shoes, or clothing. The State asserts that there was no evidence before the district court to support this illogical assumption given the number of other

plausible scenarios for how blood evidence may have come to be on the gloves, shoes, or clothing of someone present, participating in, and witnessing murders in small rooms at close range. It argues that such a conclusion ignores the fact that either direct or high-velocity transfers of blood could have occurred in several other ways.

The State contends that blood could have been transferred to Nissen's gloves, shoes, or clothing when he stood next to Brandon as she was shot by Lotter; when Nissen grabbed Brandon and stabbed her after she had been shot by Lotter; when Nissen stood near the bed as Lambert was shot in the abdomen; when Nissen took Lambert's baby from her arms after she had been shot in the abdomen by Lotter; when Nissen stood in the bedroom while Lotter shot Lambert in the head; when Nissen was in the living room, moving toward Lotter, as Lotter shot DeVine twice; and when Nissen was in physical contact with Lotter during or after the murders, including when Nissen was directed to hand his gloves to Lotter, who placed the gloves "end-over-end" over a box containing the bloody knife and the gun, and threw the bundle onto the frozen Nemaha River.

The State further argues that evidence adduced at the hearing on Lotter's amended motion for DNA testing further indicated that such evidence cannot establish how a particular DNA sample was deposited on a specific piece of evidence but may only assist in determining who is, or is not, the source of the DNA. The State asserts, therefore, that DNA testing could not establish Lotter's theory that Nissen shot and killed all three victims even if one or more of the victims' DNA is found on the gloves, shoes, or clothing worn by Nissen. The State also notes that Lotter had an opportunity to refute Nissen's account of what occurred at the crime scene when Lotter took the stand at his trial. Lotter testified at trial that he was not present when the murders took place.

The State contends that even if Lotter could establish through DNA testing that Nissen was the shooter, this would not demonstrate that Lotter was wrongfully convicted. It asserts DNA testing cannot establish that Lotter did not take part in the planning of the murders, that Lotter did not travel to Lincoln looking for Brandon in order to murder her, that Lotter did not steal the gun

or obtain the knife and gloves used in the murders, that Lotter did not take part in the burglary of the farmhouse, or that he was not present at the scene of the murders.

The State also asserts that DNA testing would not lead to noncumulative, exculpatory evidence relevant to Lotter's claim that he was wrongfully sentenced even if such testing were to convince a trier of fact that Nissen, rather than Lotter, was the shooter of all three victims. The State argues that Lotter's assumption that he would not have been sentenced to death if the sentencing panel had concluded that he was not the shooter is directly contrary to the sentencing order.

The State points out that the sentencing panel concluded that there was no appreciable difference in degree of culpability between Lotter or Nissen during the planning and preparation stages of their crimes, nor during the actual commission of the murders. The State notes that the panel stated that the difference in the penalties given Lotter and Nissen was justified, not by which defendant was the shooter but by Nissen's agreement to testify at Lotter's trial and by the fact that Nissen's cooperation provided both the initial information and the physical evidence which led to the successful prosecutions of both defendants.

### (c) District Court's Order

The district court found that Lotter's goal in requesting DNA testing was to establish that Nissen was the shooter. The court noted that the jury found Lotter guilty of three counts of first degree murder and that it could have reached those verdicts by any one of three theories: premeditated murder, felony murder, or aiding and abetting first degree murder. The jury was not required to indicate upon which of the three theories it based its guilty verdicts. The court found that there was considerable circumstantial evidence against Lotter without Nissen's trial testimony and that even if DNA evidence established that Nissen was the shooter, this would not be exculpatory evidence that Lotter was wrongfully convicted.

Furthermore, the district court found that a determination that Nissen was the shooter would not change the result of Lotter's sentencing. It noted that the sentencing panel found that during the planning and preparation stages in the days leading up to the

murders, there was no appreciable difference in the degree of culpability between Lotter and Nissen. The panel also found, based on Nissen's account, that there was no appreciable difference in the degree of culpability between Lotter and Nissen during the actual commission of the murders or after they were committed. It concluded that Nissen's statement to the police after his arrest and his testimony for the State at Lotter's trial sufficiently distinguished his conduct from Lotter's for purposes of imposing different penalties.

The district court also found that DNA testing could not provide exculpatory evidence on Lotter's behalf. The court opined that it is a "leap in logic" given the facts submitted at trial for Lotter to assume that if the blood of one or more of the victims is on Nissen's gloves, shoes, or clothing, this would establish Nissen as the shooter. In its order denying Lotter's amended motion for DNA testing, the court asked, Why would Nissen not have blood on his clothing when he claimed to have stabbed Brandon in the abdomen while pulling her toward him? The court determined that the presence of blood on Nissen's gloves, shoes, or clothing would only support his testimony and that the absence of blood would prove nothing for Lotter. It concluded that DNA testing alone could never establish Lotter's claims because such testing could never establish how a particular DNA sample was deposited on a specific piece of evidence.

The district court distinguished this case from one in which the identity of a single perpetrator is at issue or the evidence against the defendant is so weak as to cast real doubt about guilt. It concluded that DNA testing would not result in noncumulative, exculpatory evidence relevant to any claim that Lotter was wrongfully convicted or sentenced.

### (d) Would DNA Testing Affect Lotter's Convictions?

The DNA testing requested by Lotter might show that DNA from any or all of the three victims is present on Nissen's gloves, shoes, or clothing. However, such testing could not establish exculpatory evidence that Lotter was wrongfully convicted. Furthermore, the presence of the victims' DNA on these items would not support the admissibility of Nissen's statements to Haley, his cellmate, because such evidence would not constitute

corroborating circumstances that clearly indicate the trustworthiness of those statements. See *State v. Lotter, ante* p. 245, 664 N.W.2d 892 (2003). The victims' blood on Nissen's gloves, shoes, or clothing would not be inconsistent with his trial testimony.

Nissen testified that he followed Lotter into Lambert's bedroom, where they found her lying on the bed. Brandon was on the floor hiding under a blanket, and Lambert's baby was in a crib. Nissen stated that he grabbed Brandon's arm, told her to stand up, and turned around to try to quiet the baby. The evidence established that Lotter then shot Brandon. When Nissen saw Brandon still twitching, he asked Lotter for a knife, grabbed Brandon's shoulder with his left hand, and pulled her toward him at the same time he pushed the knife into her abdominal area. Brandon fell back onto the bed and was no longer moving. At some point, Nissen handed the knife back to Lotter.

Nissen said that after he handed the baby to Lambert and stepped away from the bed, Lotter shot Lambert in the stomach. Lambert jumped and screamed, and Nissen put the baby back in the crib. Nissen stated that only about 10 seconds elapsed from the time he stabbed Brandon to the time Lambert was shot.

Nissen testified that Lotter then spent 4 to 5 seconds trying to move the sliding mechanism on the gun, which appeared to be jammed. Nissen asked Lambert if there was anyone else in the house, and she told him that DeVine was in another room. Lotter went to locate DeVine, and in 5 to 8 seconds, he came back into the bedroom with DeVine. Lambert was bleeding and appeared to be in pain. Nissen stated that Lotter raised his pistol and shot Lambert in the eye. Her head jerked back, and she went limp on the bed.

Nissen, Lotter, and DeVine left the bedroom and went into the living room. Lotter stopped in the middle of the room, while Nissen and DeVine walked past Lotter. Nissen told DeVine to sit down on the couch. Nissen then moved back toward Lotter, and Lotter raised his pistol and shot DeVine. DeVine slumped back onto the couch, and Lotter shot him again.

Lotter then went back into Lambert's bedroom, with Nissen following 2 or 3 seconds behind. Nissen heard two or three more shots just before he entered the bedroom. After Nissen and Lotter left the house and were in Lotter's car, Lotter asked Nissen for

his gloves. Lotter put the gloves "end-over-end" over a box containing the gun and the knife.

The function of testing DNA evidence is to determine whether the sample being examined contains genetic characteristics similar to a sample from a known individual. There are two possible outcomes when comparing the samples. If the DNA test results from the samples match, i.e., the same DNA types are found at all loci tested from both samples, then the conclusion is that the sample from the known individual cannot be excluded as a possible source of the sample in question. If, on the other hand, the genetic information present in the DNA from the known individual is not present in the DNA from the sample being tested, then the DNA profiles do not match and the known individual is excluded as the source of the DNA sample in question.

In the case at bar, the victims could be the source of the blood samples in question. DNA testing could establish that the blood came from one or more of the victims, but it could not determine how the blood was deposited upon the items being tested. Since the results of DNA testing could not establish how the blood was deposited on Nissen's gloves, shoes, or clothing, the results could not establish that Nissen shot the victims. Therefore, the results of such testing could not be exculpatory.

Contrary to Lotter's argument, DNA evidence is not a videotape of a crime. In this case, such testing could show only whose blood is on the items in question, not how the blood was deposited on the items. It would be mere speculation to conclude that blood was on Nissen's gloves, shoes, or clothing because he was the shooter. Therefore, the record does not support a conclusion that the DNA testing requested by Lotter may produce noncumulative, exculpatory evidence relevant to the claim that he was wrongfully convicted.

A motion for DNA testing is similar to a motion for new trial based on newly discovered evidence. Therefore, a motion for DNA testing is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. See *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000). Today, we hold that a motion for DNA testing under the DNA Testing Act is addressed to the discretion

of the trial court, and unless an abuse of discretion is shown, the determination of the trial court will not be disturbed on appeal. We conclude that the district court did not abuse its discretion in refusing DNA testing because such testing could not establish exculpatory evidence that Lotter was wrongfully convicted.

### (e) Would DNA Testing Affect Lotter's Sentences?

As to whether DNA testing could produce noncumulative, exculpatory evidence relevant to the claim that Lotter was wrongfully sentenced, we note that the presence of the victims' DNA on Nissen's gloves, shoes, or clothing would not be inconsistent with any evidence the sentencing panel relied upon in determining Lotter's sentence. Therefore, the aggravating and mitigating circumstances found by the panel would remain unaffected, and Lotter's sentence of death would stand.

As to the murder of Lambert, the sentencing panel found the following aggravating circumstances to be applicable: the second prong of (1)(b) ("[t]he murder was committed in an apparent effort . . . to conceal the identity of the perpetrator of a crime") and (1)(e) ("[a]t the time the murder was committed, the offender also committed another murder"). See § 29-2523. As to the murder of DeVine, the panel found the following aggravating circumstances to be applicable: the second prong of (1)(b) and (1)(e). As to the murder of Brandon, the panel found the following aggravating circumstances to be applicable: (1)(e) and the second prong of (1)(h) ("[t]he crime was committed to disrupt or hinder . . . the enforcement of the laws"). See *id.*

The sentencing panel also found mitigating circumstance (2)(g) to be applicable ("[a]t the time of the crime, the capacity of the defendant . . . to conform his conduct to the requirements of law was impaired as a result of mental illness"). See *id.* The panel also found the existence of nonstatutory mitigating circumstances with respect to Lotter's childhood, family history, and history of mental disorder.

The sentencing panel relied in part upon Nissen's trial testimony and made a finding that Lotter shot all three victims. The presence of the victims' DNA on the items sought to be tested would not be inconsistent with Nissen's testimony and could not show that Lotter was not the shooter.

When comparing Lotter's and Nissen's participation in the homicides, the sentencing panel stated:

> At the time of the actual commission of these three homicides, the evidence, based largely upon Marvin Nissen's testimony, is that Defendant-Lotter fired all shots at all three victims resulting in their deaths. . . .
>
> . . . .
>
> Nissen did admit during his testimony at Lotter's trial that he had, in fact, been the one who stabbed Teena Brandon, but claimed that he did so after Lotter had finished shooting her.

Despite its finding that Lotter "fired all shots at all three victims resulting in their deaths," the sentencing panel made the following statement: "Suffice it to say that under either version of when Nissen stabbed Teena Brandon, we find that there is no appreciable difference in degree of culpability between these Co-Defendants during the actual commission of the homicides."

In addition, the evidence also established that Lotter stole the gun used to murder the victims. He also obtained the knife and the gloves worn during the crimes. Just prior to the killings, both Nissen and Lotter were seen wearing gloves. The evening of the murders, Lotter told a witness he desired to kill someone. After the murders, Nissen and Lotter sought to obtain alibis from Kandi and McKenzie. There was evidence indicating that Lotter had traveled to Lincoln looking for Brandon in order to murder her. Thus, the evidence clearly established that Lotter actively participated in the planning and execution of these murders.

In comparing the actions of Lotter and Nissen following the murders, the sentencing panel stated:

> Nissen's statement to Investigator [Roger] Chrans does distinguish his conduct from Defendant Lotter after commission of the crimes.
>
> . . . .
>
> . . . We further find that Nissen's testimony against Lotter at his trial does distinguish his conduct from Defendant-Lotter after commission of the crime.
>
> In conclusion the panel finds beyond a reasonable doubt that Marvin Nissen's statement to the police after his arrest, and his testimony for the State at John Lotter's trial, does

sufficiently distinguish his conduct from Lotter's after commission of these homicides, and does support imposition of different penalties for each Co-Defendant.

We conclude that the results of DNA testing could not produce noncumulative, exculpatory evidence relevant to the claim that Lotter was wrongfully sentenced. As the sentencing panel correctly concluded, the record is barren of any evidence that Lotter was merely an accomplice or that his participation was relatively minor. There was no appreciable difference in the degree of culpability between Nissen and Lotter during the actual commission of the murders. We conclude that the district court did not abuse its discretion in denying DNA testing because the testing could not produce noncumulative, exculpatory evidence relevant to the claim that Lotter was wrongfully sentenced.

### 3. Denial of Request to Attend Hearing

Lotter next assigns as error that the district court erred in refusing to allow him to attend the hearing on his amended motion for DNA testing. A week prior to the hearing on his amended motion, Lotter filed an application for writ of habeas corpus ad prosequendum, requesting that he be allowed to attend the hearing. No hearing on the application was requested by Lotter. The district court denied the application, and the hearing on the amended motion proceeded in Lotter's absence. The court noted that it had reviewed the application but denied the request because there was no specific reason offered to justify granting the writ. The court explained that it did not see any reason to have Lotter at the hearing.

Lotter argues that as a matter of due process, he had the right to attend the hearing on his amended motion for DNA testing. He argues that Neb. Rev. Stat. § 29-2001 (Reissue 1995) requires that a person indicted for a felony be present at trial. He also quotes *State v. Bear Runner*, 198 Neb. 368, 370, 252 N.W.2d 638, 640 (1977), for the proposition that "an accused has a right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." He argues that this court has recognized that an even stricter standard applies in capital cases.

Lotter notes that in *State v. Woods*, 180 Neb. 282, 142 N.W.2d 339 (1966), this court held that in a civil motion for

postconviction relief, a prisoner has no right to be personally present at the evidentiary hearing on the motion unless the prisoner is going to testify. He also points out that as early as *Davis v. State*, 51 Neb. 301, 70 N.W. 984 (1897), we held that a prisoner cannot insist as a matter of right that he be personally present at a hearing on a motion for new trial following a first degree murder conviction.

■ Lotter then argues, however, that subsequent to *Davis*, the U.S. Supreme Court held that a defendant has a due process right to be present at a proceeding

> whenever his presence has a relation, reasonably substantial, to the ful[l]ness of his opportunity to defend against the charge. . . .
>
> . . . .
>
> . . . [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.

*Snyder v. Massachusetts*, 291 U.S. 97, 105-08, 54 S. Ct. 330, 78 L. Ed. 674 (1934), *overruled in part, Malloy v. Hogan*, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964).

Lotter asserts that only in minor, nonsubstantive proceedings has the U.S. Supreme Court allowed matters to be conducted without the defendant. He claims he was denied his right to attend a hearing in which evidence was presented in support of and in opposition to a motion that might prove instrumental in obtaining his release from a conviction and sentence.

Although in *State v. Bjorklund*, 258 Neb. 432, 468, 604 N.W.2d 169, 205 (2000), we stated that "[a] defendant has a constitutionally protected right to be present at all critical stages of his or her trial," it is apparent that Lotter's trial has long since been concluded. Lotter has exhausted his direct appeal. See *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), *modified on denial of rehearing* 255 Neb. 889, 587 N.W.2d 673 (1999). His motions for postconviction relief have been subsequently denied. See *State v. Lotter, ante* p. 245, 664 N.W.2d 892 (2003).

■ A motion for DNA testing is similar to a motion for new trial, as opposed to a collateral postconviction attack on a final judgment. However, Lotter still has no constitutional right to be present at any hearing concerning a motion filed under the act.

In *State v. Wells*, 197 Neb. 584, 249 N.W.2d 904 (1977), we noted that it had long been the rule in Nebraska that a person convicted of a felony who was represented by counsel could not, as a matter of right, insist on being present at the time of filing, the argument, or the ruling upon his motion for new trial.

In addition, there is no language in the DNA Testing Act to suggest that a convicted defendant has the right to be present for any proceeding conducted under the act. This court acknowledges that an exception might apply if the defendant were to offer testimony for the court's consideration. However, such circumstances are not present in this case.

In *Wells*, 197 Neb. at 591-92, 249 N.W.2d at 909, we adopted the following from *Council v. Clemmer*, 177 F.2d 22 (D.C. Cir. 1949):

> "Appellant says he was not present when the motion for new trial was argued by his counsel, and that his absence was a violation of his constitutional right to be present. The argument upon that motion was not a part of the trial; it was an effort to get another trial. It dealt with questions of law and alleged errors in the trial. There was no constitutional requirement that the defendant be present."

We conclude that the district court did not err in denying Lotter's application for writ of habeas corpus ad prosequendum, in which he requested that he be present at the hearing on his amended motion for DNA testing.

### 4. CROSS-APPEAL

On cross-appeal, the State argues that the district court erred when it determined that DNA testing was effectively not available at the time of Lotter's trial in 1995. The statutory language in question is "such testing was effectively not available at the time of trial." See § 29-4120(5). The State asserts that the court erred in focusing on the continuing sophistication of DNA technology rather than focusing on what was available in 1994 and 1995 and whether such testing would have served the purpose for which Lotter sought the testing. It claims that DNA test results proving that the victims' blood was on the gloves, shoes, or clothing worn by Nissen could have been obtained at the time of Lotter's trial and that, therefore, DNA testing was effectively available.

Relying on the language of § 29-4120(1)(c), the district court found that based upon the affidavits submitted by the parties, present DNA techniques would provide a reasonable likelihood of more accurate and probative results than the techniques existing in May 1995. In an appeal from a proceeding under the DNA Testing Act, the trial court's findings of fact will be upheld unless such findings are clearly erroneous. *State v. Poe, ante* p. 437, 665 N.W.2d 654 (2003). The court therefore concluded that present DNA techniques were effectively not available at the time of Lotter's trial in May 1995.

At the hearing on Lotter's amended motion for DNA testing, the State submitted the affidavit of Charlotte Word, Ph.D., of Orchid Cellmark (Cellmark), formerly Cellmark Diagnostics. Word's affidavit stated that restriction fragment length polymorphism (RFLP) DNA testing has been available in the U.S. and widely used by private and public crime laboratories since the late 1980's. The affidavit stated that RFLP testing using four to five probes has a high degree of discrimination.

Word's affidavit also stated that DNA polymerase chain reaction (PCR) testing has been used widely by private and public crime laboratories in the U.S. and worldwide since the early to mid-1990's. Several different PCR-based test systems have been developed for use in forensic cases since the early 1990's. The affidavit stated that testing using the "AmpliType™ HLA DQα Forensic PCR Amplification and Typing Kit" (DQα) was offered by major laboratories in the U.S., including Cellmark, for forensic cases by the summer of 1992. By 1994, the DQα was in wide use. There are 21 possible genotypes at the DQα locus. Using the DQα alone, it is estimated that individuals will be distinguished about 93 percent of the time.

The affidavit further stated that for any DNA test used in crime laboratories, if interpretable test results are obtained from an evidence sample and those results are compared to the results obtained from a known individual using the same test system, then there are two possible outcomes of the comparison. If the DNA test results from two samples match, that is, the same DNA types are obtained at all loci tested for both samples, then the conclusion is that the tested individual cannot be excluded as a possible source of the sample. That individual is included as a

possible source of the DNA sample. Alternatively, if there are results present in the DNA from the known individual that are not present in the DNA from the evidence sample, then the profiles do not match and the individual is excluded as, or cannot be, the source of the DNA sample. Word's affidavit stated that to obtain a greater level of discrimination, the $DQ\alpha$ test has been used in combination with other PCR-based tests to obtain a more detailed DNA profile.

Word's affidavit stated that the next form of PCR testing to become available was the "AmpliType® PM Amplification and Typing Kit" (PM). The affidavit explained that the PM test allowed for the typing of five regions of DNA and that using the PM test alone, 972 distinct genotypic combinations were possible. The kit became commercially available in late fall of 1993. Cellmark and other major laboratories in the U.S. began offering PM testing in January 1994. Word's affidavit noted that by mid-1995, Cellmark alone had performed PCR-based testing in over 800 cases.

The affidavit stated that the $DQ\alpha$ and PM tests were combined, and Cellmark was offering the combination by January 1994. When combined, $DQ\alpha$ and PM testing offered results with a power of discrimination of over .999. Word's affidavit stated that if there was a mixture of DNA on a particular evidence sample, it was highly probable that either test used alone or the combined testing would reveal the presence of a mixture. The affidavit explained that the combination of $DQ\alpha$ and PM testing offered an extremely high exclusionary rate. As an example, the affidavit explained that bloodstained clothing seized from a suspect could be tested and compared to the DNA profile from a victim to determine whether the victim was included or excluded as the source of the DNA. If a victim was not the source, there was a greater than 99 percent probability that combined $DQ\alpha$ and PM testing would exclude the victim as the source.

Word's affidavit stated that short tandem repeat (STR) testing became commercially available in 1994 and that Cellmark began offering this type of PCR testing in the fall of 1994. The first STR kit commercially available was the "CTT STR" kit, and used alone, CTT STR testing could detect a minimum of 36, 15, and 36 separate genotypes, respectively, for each of three

loci. The affidavit stated that the CTT STR kit was also used in combination with previous PCR kits. It stated that frequencies of the DNA profiles obtained from casework samples using DQα, PM, and CTT STR in combination were generally more rare than 1 in 1 million individuals. Word's affidavit stated that by May 1995, Cellmark had completed testing in approximately 20 criminal cases nationwide using CTT STR, DQα, and PM tests in combination, analyzing nine separate loci. The CTT STR kit was replaced in 1999 by testing using the 13 core STR CODIS (Combined DNA Index System) loci.

Word's affidavit stated that the difference between DNA testing available prior to May 1995 and current DNA testing is the ongoing discovery and validation of additional loci for analysis in a single or combined test. As more loci are validated and tested, the discriminating power of the DNA test results continues to increase. The affidavit stated that all available PCR-based DNA tests developed for DNA identification testing in criminal cases in 1994 and 1995 had a high power of discrimination and a high probability of excluding someone who was not the source of the biological sample.

Word explained as an example that if a victim was not the source of a bloodstain on a suspect's clothing, it is highly likely that the victim would be excluded as the source of the sample using any one of the tests alone, and certainly more likely as more tests are used. She also explained that on the contrary, if the victim is the source of the DNA, the victim will never be excluded as the source no matter how many additional loci are tested using any number of additional tests. The affidavit stated that it would be the extremely rare exception that an individual would be excluded as a source of a sample by testing with the remaining 9 of the 13 core STR loci if that individual was not excluded by CTT STR, DQα, and PM testing.

Word's affidavit also stated that in 1994 and 1995, at the request of the Nebraska Assistant Attorney General James Elworth, Cellmark conducted RFLP DNA testing on a blood swatch from Brandon and compared it to blood on the knife in evidence. The approximate frequencies of the DNA banding pattern obtained from the stained knife swab and the blood swatch from Brandon were reported as approximately 1 in 2.3 billion in

the Caucasian population, 1 in 18 billion in the African American population, and 1 in 1.8 billion in the Western Hispanic population. Cellmark also conducted RFLP DNA testing on samples of blood from Lotter and Nissen and compared the results to biological material from pieces of evidence related to the alleged sexual assault of Brandon.

Lotter argues that under the DNA Testing Act, the issue should be phrased as whether STR testing using the PowerPlex 16 system and the ABI Prism 310 genetic analyzer was effectively available at the time of his trial. He asserts that the court's focus should be on the specific DNA testing requested and that the court should not engage in speculation regarding what other DNA tests might have been available at the time of trial. He argues that the State appears to view DNA testing in some sort of generic fashion, equating RFLP testing with STR testing. He asserts that the State's arguments ignored the technical problem presented by small mixed samples of biological material and the value in obtaining results over multiple loci through PCR amplification. Accordingly, Lotter argues that multiloci PCR technology was simply not available in 1994 and 1995.

At the hearing on his amended motion for DNA testing, Lotter submitted the affidavit of Ronald Rubocki, Ph.D. Rubocki's affidavit stated that RFLP DNA testing has the capability of being very discriminating in identifying the source of particular samples of DNA but that it will work well only with a large sample of DNA. The affidavit also stated that RFLP testing requires that the DNA not be degraded as a result of time or environmental factors and that problems can occur when there is a mixed sample.

Rubocki's affidavit stated that PCR testing is effective even if the sample of DNA contains only a few copies of the allele because the polymerase induces a chain reaction that increases the target number several millionfold. The affidavit stated that the advantage of PCR testing is that it requires very little biological material.

According to Rubocki's affidavit, DNA testing was being performed at that time using STR loci. In November 1997, the Federal Bureau of Investigation announced the selection of 13 core STR loci to constitute the U.S. national database called CODIS. The affidavit stated that the PowerPlex 16 system had

recently been developed and that this system contained all the 13 core STR loci in a single amplification reaction.

Rubocki's affidavit stated that in 1995, there was no capacity for forensic DNA testing within the State of Nebraska. In 1996, the first forensic DNA testing in Nebraska was performed at the University of Nebraska Medical Center's human DNA identification laboratory using DQα, PM, and a total of six STR loci. The affidavit stated that the current PowerPlex 16 system has numerous advantages over earlier DNA testing systems. It stated that amplification of minute samples of DNA can be accomplished that was not possible with RFLP DNA techniques. Amplification is now possible even if the DNA has been moderately degraded, whereas the RFLP analysis requires a nondegraded sample. The affidavit stated that "the identification of alleles at 15 STR loci provides a tremendous advantage for discrimination and identification of contributors, particularly when dealing with a potentially mixed sample."

The DNA Testing Act provides in part:

> While DNA testing is increasingly commonplace in pretrial investigations currently, it was not widely available in cases prior to 1994. Moreover, new forensic DNA testing procedures, such as polymerase chain reaction amplification, DNA short tandem repeat analysis, and mitochondrial DNA analysis, make it possible to obtain results from minute samples that previously could not be tested and to obtain more informative and accurate results than earlier forms of forensic DNA testing could produce. As a result, in some cases, convicted inmates have been exonerated by new DNA tests after earlier tests had failed to produce definitive results.

§ 29-4118(3).

■ Interpretation of a statute presents a question of law, in connection with which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *Johnson v. Kenney*, 265 Neb. 47, 654 N.W.2d 191 (2002). In construing a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense. *Id.* If it can be avoided, no word, clause, or sentence of a statute should be rejected as

superfluous or meaningless. *State v. Rhea*, 262 Neb. 886, 636 N.W.2d 364 (2001).

The question before us is whether DNA testing requested pursuant to a motion filed under § 29-4120(1) was effectively not available at the time of Lotter's trial. See § 29-4120(5). Thus, we must determine whether the Legislature intended § 29-4120(5) to refer to the effective availability of DNA testing in general or the effective availability of the specific type of DNA testing requested in Lotter's motion.

Section 29-4120(1)(c) provides that a person in custody, at any time after his or her conviction, may file a motion requesting forensic DNA testing of any biological material that, among other things, "[w]as not previously subjected to DNA testing or can be subjected to retesting with more current DNA techniques that provide a reasonable likelihood of more accurate and probative results."

In Lotter's amended motion for DNA testing, it was alleged that he intended to utilize the PowerPlex 16 amplification and multiplex identification system with the ABI Prism 310 genetic analyzer to test items containing biological evidence, including a pair of yellow work gloves; cuttings taken from the gloves; Nissen's shoes and clothing; and known comparison blood samples from Brandon, Lambert, and DeVine. Lotter alleged that the PowerPlex 16 system first became available in May 2000 and that the ABI Prism 310 genetic analyzer was first used by the University of Nebraska Medical Center's human DNA identification laboratory in September 1998. He further alleged that Nissen's gloves, shoes, and clothing have not been subject to any DNA testing.

We interpret § 29-4120(5) to require that the DNA testing requested in the motion was effectively not available at the time of trial. The State does not dispute the fact that the PowerPlex 16 system was not available at the time of Lotter's trial in May 1995. Nor does it dispute that such testing would provide a reasonable likelihood of more accurate and probative results. Therefore, we conclude that the DNA technique requested by Lotter was effectively not available at the time of his trial.

This conclusion is supported by our consideration of the DNA Testing Act in pari materia. Section 29-4118(3) specifically

recognizes that advances in DNA procedures have and will occur and that such advances make it possible to obtain more informative and accurate results. We are required to give effect to the purpose and intent of the Legislature as ascertained from the entire language of the act. Therefore, from a literal reading of the act as considered in its plain language, we conclude that if types of DNA testing are currently available that were effectively not available at the time of trial and if such testing will produce more accurate and probative results, then the statutory requirements have been met. Therefore, the district court did not err in its interpretation of the requirements of the DNA Testing Act, and we conclude that the State's cross-appeal is without merit.

## VI. CONCLUSION

For the reasons set forth herein, we affirm the judgment of the district court. The DNA testing requested by Lotter could not result in noncumulative, exculpatory evidence relevant to Lotter's claim that he was wrongfully convicted or sentenced. The State's cross-appeal is dismissed.

AFFIRMED.