Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/03/2020 08:09 AM CDT

State of Nebraska, appellee, v.
James E. Myers, appellant.
___ N.W.2d ___

Filed January 10, 2020.    No. S-19-345.

1. **DNA Testing: Appeal and Error.** A motion for DNA testing is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.
2. ____: ____. An appellate court will uphold a trial court's findings of fact related to a motion for DNA testing unless such findings are clearly erroneous.
3. ____: ____. Decisions regarding appointment of counsel under the DNA Testing Act are reviewed for an abuse of discretion.
4. **DNA Testing.** Nebraska's DNA Testing Act is a limited remedy providing inmates an opportunity to obtain DNA testing in order to establish innocence after a conviction.
5. ____. If the criteria set forth in Neb. Rev. Stat. § 29-4120(1) (Reissue 2016) are met and if the court further determines that the requirements of § 29-4120(5) have been met, then the court must order testing.
6. **DNA Testing: Evidence.** The requirement that requested DNA testing produce noncumulative exculpatory evidence is relatively undemanding for a movant seeking DNA testing and will generally preclude testing only where the evidence at issue would have no bearing on the guilt or culpability of the movant.
7. ____: ____. DNA evidence is not a videotape of a crime, and testing shows only whether the biological sample in question belonged to the person tested against.
8. **DNA Testing.** The nonpresence of an individual's DNA profile in a biological sample does not preclude that individual from having been present or in possession of the item tested.
9. ____. The nonpresence of an individual's DNA profile in a biological sample merely shows the individual's DNA was not present in the specific biological sample tested.

10. **DNA Testing: Prosecuting Attorneys: Evidence.** Whether the prosecution improperly withheld evidence is not properly presented in a motion for DNA testing.

Appeal from the District Court for Douglas County: J. Michael Coffey, Judge. Affirmed.

James E. Myers, pro se.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ.

Funke, J.

James E. Myers appeals the district court's denial of his motion for testing under Nebraska's DNA Testing Act[1] and his motion for the appointment of counsel. Myers argues the district court erred in denying his motion by determining that the requested testing would not produce noncumulative exculpatory evidence, denying his request for counsel, and determining that the State did not withhold evidence. This appeal follows our decisions on direct appeal[2] and after remand on an initial denial of Myers' motion for DNA testing.[3] For the reasons set forth herein, we affirm.

BACKGROUND

Myers was convicted of first degree murder, use of a deadly weapon in the commission of a felony, and possession of a deadly weapon by a felon in connection with the 1995 shooting death of Lynette Mainelli. The State's factual allegations asserted that Myers was worried Mainelli was talking to the police about another person, so he killed Mainelli. After a

---

[1] Neb. Rev. Stat. § 29-4116 et seq. (Reissue 2016).

[2] *State v. Myers*, 258 Neb. 300, 603 N.W.2d 378 (1999).

[3] *State v. Myers*, 301 Neb. 756, 919 N.W.2d 893 (2018).

trial and guilty verdicts, Myers' convictions were affirmed on direct appeal.[4] In Myers' direct appeal, we rejected his claim of insufficient evidence and summarized the evidence presented at trial, in relevant part:

> Edward Wilson testified that he was in the van driven by Myers the night Mainelli was killed. Myers drove to the Blue Lake Manor Apartments, where Mainelli lived. Myers got out of the van, and . . . Wilson saw that he had on gloves. Myers went to the back of the van, and . . . Wilson heard a "clacking" noise, which he recognized as the sound of a bullet moving into a chamber. Myers then left the van and walked toward the apartment complex. He was gone for about 1 hour, and upon his return, he got in the van and took the passengers home [including Wilson and Sam Edwards].
>
> . . . Edwards testified that as Myers dropped him off, Myers gave him a handgun and told him to "put it up" because the police were out and Myers had in-transit stickers on the van. Earlier, Edwards had seen the pistol on Myers' lap. Edwards subsequently retrieved the pistol and gave it to . . . Wilson, who stated the pistol had once belonged to his sister [and] testified that he recognized the gun because it had a unique color and a name written on it and that he thought the black handle was unusual. . . . Wilson sold the pistol because he suspected that it had been used in the murder of Mainelli. The pistol was the same caliber as two .22-caliber casings found beside Mainelli's body. Daniel Bredow, a firearm toolmarks examiner with the city of Omaha, testified that he compared the bullets found at the crime scene with bullets fired from the gun Myers gave Edwards. Bredow concluded that the bullets taken from the crime scene had been fired by the gun which could be traced to Myers.

---

[4] *Myers, supra* note 2.

[Timothy Sanders, who was in the same gang as Myers,] testified that in the summer and early fall of 1995, Myers had said that Mainelli was going to testify against Charles Duncan, so she needed to have "her cap pulled back and to be shot." Sanders saw Myers with a small .22-caliber handgun in the summer of 1995. . . . [Wilson's sister] testified that in December 1996, after Mainelli's death, Myers had told her to tell the police he was with her at the time of the killing.[5]

In review of the trial record, the State also presented evidence about Myers' plan to be intimate with Mainelli in connection with the shooting.[6] Timothy Sanders testified that Myers told him Mainelli needed to be shot and that Myers said he was going to have sex with Mainelli.[7] After Mainelli's death, Sanders testified that Myers told him that Mainelli walked into her bedroom, took off her clothes, and lay on the bed and that Myers shot her once the lights were out.[8] Specifically, in response to questions by the prosecution, Sanders had explained:

A. . . . [H]e told me he was going to have sex with her. He was gonna kick with her, something of that nature, yeah.

. . . .

Q. After the death of . . . Mainelli —

. . . .

. . . did you have a conversation with . . . Myers concerning the events of that night, the night of her death?

A. Yeah.

Q. What did he tell you?

A. Just that he knocked on the door. She let him in. I guess they acted like — he acted like he was about

---

[5] *Id*. at 312-13, 603 N.W.2d at 388-89.

[6] *Myers, supra* note 3.

[7] *Id.*

[8] *Id.*

to have sex with her or something. And once the lights [were] out, he shot her.

The State referenced this exchange in its opening statements and explained:

Myers told . . . Sanders that he killed . . . Mainelli; and, more particularly, he told [him] how. He told him that he had shot her; that he talked to her. He convinced her to have sex with him; and that when she had laid down in the bed, he got next to her and shot her in the temple, and she was still moving so he shot her in the temple again.

In closing arguments, the prosecutor summarized: "She took off her clothes; she laid on the bed. He put the gun towards her temple and he shot her."

In 2016, Myers filed his motion for "DNA testing of items of evidence that may contain biological material" pursuant to the DNA Testing Act. Myers listed items of evidence taken from the crime scene, including Mainelli's bedding, bullets, spent .22-caliber casings, beverage containers, clothing, spiral notebooks, cigarette butts and ashtray contents, a gunshot residue test kit from Mainelli's hands, vials of Mainelli's blood, a sexual assault kit, and hair samples. Myers sought to have these items tested in order to exclude himself as a donor of any biological material. Myers asserted that if the testing revealed the presence of other males and failed to confirm his presence, he would be proved innocent. Myers additionally claimed the State withheld findings of biological evidence from him and asked for the appointment of counsel.

The State filed an inventory of evidence confirming the items Myers wished to have tested were in the State's possession.

Following a hearing, the district court denied Myers' motion. The court found DNA testing was not warranted under § 29-4120(5) because the results would not provide exculpatory evidence. However, the court comingled its analysis of whether to require testing under § 29-4120(5) with the more onerous standard for vacating and setting aside a judgment based upon test results under § 29-4123(2) and (3). Accordingly, on appeal,

we remanded the issue to the district court for a determination of Myers' motion based solely upon the requirements of § 29-4120(5), including whether DNA testing of the items requested may produce noncumulative exculpatory evidence which is favorable to Myers and material to the issue of his guilt.[9] Because we remanded the issue of whether Myers' motion for testing should be granted, we also remanded the issue of whether Myers made the requisite showing for the appointment of counsel.[10] We also held that whether the prosecution improperly withheld evidence is not properly presented in a motion for DNA testing and that upon remand, the district court need not consider this argument further.[11]

On remand, the court again denied Myers' motion for DNA testing and determined that, applying only those grounds listed in § 29-4120(5), the results would not provide noncumulative exculpatory evidence. The court first addressed Myers' allegation that testing of the items would fail to detect his DNA. Even if this allegation proved to be true, the court reasoned such a result would prove neither that Myers was not there nor that he did not commit the crimes of which he was convicted. Similarly, the court found Myers' allegation that the DNA results would show other men had been in Mainelli's apartment would not provide evidence that Myers was not there and did not commit the crimes. Regarding the sexual assault kit specifically, the court noted that the State's arguments and the witnesses' testimony did not allege Myers actually had sexual intercourse with Mainelli prior to murdering her and that thus, the absence of his DNA from the sexual assault kit would not exculpate him. Because the court overruled Myers' motion for testing and found the testing would not provide noncumulative exculpatory evidence, the court also declined to appoint counsel.

---

[9] *Id.*

[10] *Id.*

[11] *Id.*

## ASSIGNMENTS OF ERROR

Myers assigns the district court erred by (1) overruling his motion for DNA testing and finding that testing would not produce noncumulative exculpatory evidence, (2) overruling his motion to appoint counsel, and (3) failing to determine the State withheld evidence.

## STANDARD OF REVIEW

[1,2] A motion for DNA testing is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.[12] An appellate court will uphold a trial court's findings of fact related to a motion for DNA testing unless such findings are clearly erroneous.[13]

[3] Decisions regarding appointment of counsel under the DNA Testing Act are reviewed for an abuse of discretion.[14]

## ANALYSIS

### DENIAL OF MYERS' MOTION
### FOR DNA TESTING

[4] Nebraska's DNA Testing Act is a limited remedy providing inmates an opportunity to obtain DNA testing in order to establish innocence after a conviction.[15] Pursuant to the act, a person in custody takes the first step toward obtaining possible relief by filing a motion in the court that entered the judgment requesting forensic DNA testing of biological material.[16] Section 29-4120(1) provides the parameters for such motion and states:

Notwithstanding any other provision of law, a person in custody pursuant to the judgment of a court may, at any

---

[12] *State v. Betancourt-Garcia*, 299 Neb. 775, 910 N.W.2d 164 (2018).

[13] *Id.*

[14] *State v. Phelps*, 273 Neb. 36, 727 N.W.2d 224 (2007).

[15] See, § 29-4117; *Betancourt-Garcia, supra* note 12.

[16] *Id.*

time after conviction, file a motion, with or without supporting affidavits, in the court that entered the judgment requesting forensic DNA testing of any biological material that:

(a) Is related to the investigation or prosecution that resulted in such judgment;

(b) Is in the actual or constructive possession or control of the state or is in the possession or control of others under circumstances likely to safeguard the integrity of the biological material's original physical composition; and

(c) Was not previously subjected to DNA testing or can be subjected to retesting with more current DNA techniques that provide a reasonable likelihood of more accurate and probative results.

In the instant case, there is no dispute that Myers met these required criteria for filing a § 29-4120(1) motion.

[5] Contrary to Myers' contention, however, meeting the criteria to file a § 29-4120(1) motion does not require the district court to order testing. Instead, the reviewing court must also determine whether the requirements of § 29-4120(5) have been met. Section 29-4120(5) provides:

Upon consideration of affidavits or after a hearing, the court shall order DNA testing pursuant to a motion filed under subsection (1) of this section upon a determination that (a)(i) the biological material was not previously subjected to DNA testing or (ii) the biological material was tested previously, but current technology could provide a reasonable likelihood of more accurate and probative results, (b) the biological material has been retained under circumstances likely to safeguard the integrity of its original physical composition, and (c) such testing may produce noncumulative, exculpatory evidence relevant to the claim that the person was wrongfully convicted or sentenced.

Thus, if the § 29-4120(1) criteria are met and if the court further determines that the requirements of § 29-4120(5) have been met, then the court must order testing.[17]

[6] Exculpatory evidence means evidence which is favorable to the person in custody and material to the issue of the guilt of the person in custody.[18] This requirement is relatively undemanding for a movant seeking DNA testing and will generally preclude testing only where the evidence at issue would have no bearing on the guilt or culpability of the movant.[19]

Myers claims the requested testing would show other individuals were present in Mainelli's apartment and would fail to show his DNA on any of the items. He argues that such results will call into question the credibility of the State's witnesses by establishing he was not present and did not commit or participate in the crime. We agree with the district court's determination that even if correct, such results would not rise to the level of exculpatory.

In *State v. Dean*,[20] we addressed the denial of a request for DNA testing by a defendant convicted of murder. In that case, the defendant requested testing of the firearm used in the commission of the offense and argued the testing would not produce any biological material associated with him, which would prove he did not handle the firearm and was not the shooter.[21] We noted the contrary evidence concerning his possession of the firearm, including testimony from another witness and the defendant's eventual confession to police that he had shot the firearm.[22] We determined that even if the defendant was correct that DNA testing would not detect the presence of his DNA on

---

[17] *Myers, supra* note 3.

[18] § 29-4119.

[19] *State v. Buckman*, 267 Neb. 505, 675 N.W.2d 372 (2004).

[20] *State v. Dean*, 270 Neb. 972, 708 N.W.2d 640 (2006).

[21] *Id.*

[22] *Id.*

the objects in question, the result would be at best inconclusive, and certainly not exculpatory.[23] We explained:

> [A]ssuming a biological sample did exist and that [the defendant's] DNA was absent from that sample, on the record before us, it would be mere speculation to conclude that the absence of [his] DNA on the firearm and ammunition would exclude him as being the person who fired the fatal shot. This is particularly so in view of the persuasive and undisputed trial evidence to the contrary. . . . We conclude that the trial court did not abuse its discretion in refusing DNA testing because even if such tests produced the result that [the defendant] predicts, the result would not be exculpatory.[24]

[7] Likewise, in *State v. Lotter*,[25] we affirmed the denial of the defendant's request for DNA testing after his murder convictions. In that case, the defendant claimed that blood spatter from the victims on an accomplice's gloves, shoes, or clothing would establish that the accomplice was very close to the victims when they were shot and that the accomplice was not at the locations the accomplice described in his trial testimony.[26] The defendant asserted that such DNA test results would aid in establishing that the accomplice lied at trial and would prove that the accomplice shot all three victims. We concluded that the accomplice's testimony would not have been contradicted even if the defendant's claims that testing would show the victims' blood on the accomplice's clothes were correct.[27] We explained that DNA evidence is not a videotape of a crime and that testing shows only whether the biological sample in question belonged to the person tested against.[28]

---

[23] *Id.*

[24] *Id*. at 976-77, 708 N.W.2d at 645.

[25] *State v. Lotter*, 266 Neb. 758, 669 N.W.2d 438 (2003).

[26] *Id.*

[27] *Id.*

[28] *Id.*

Because other evidence received was consistent with the alleged presence of the victims' blood on the accomplice's clothes and because testing would have established only whether the blood belonged to one or more of the victims, not how it was deposited on each item, we found it would be mere speculation to conclude that blood was on the accomplice's clothing because he was the shooter.[29]

Similar to the evidence in *Dean*, the evidence received during Myers' trial contradicts Myers' underlying theory that he was not at the apartment and did not possess the gun used in Mainelli's killing.[30] Sanders testified that Myers told him prior to the murder that Mainelli needed to have "her cap pulled back and to be shot" because she was going to testify against another individual. Testimony was received from Edward Wilson and Sam Edwards, both of whom were passengers of the van that Myers drove to Mainelli's apartment on the night of her death. Wilson testified that Myers drove the van to Mainelli's apartment; got out of the van with gloves on; went to the back of the van, from where Wilson heard a noise he recognized as the sound of a bullet moving through a gun's chamber; and walked toward the apartment complex, where he stayed for about an hour until he returned to the van and took the passengers home. Edwards testified that after returning from Mainelli's apartment, Myers gave him a handgun and told him to "put it up" because the police were out and the van had "in transit stickers." Edwards further testified that he had seen the handgun on Myers' lap in the van prior to stopping at Mainelli's apartment. Sanders confirmed that he had also seen Myers with a gun matching the handgun's description around the time of the murder. The handgun was identified by witnesses, matched the caliber of the casings found by Mainelli's body, and was examined by a firearm toolmarks examiner who determined it fired the bullets recovered at the crime scene.

---

[29] *Id.*

[30] See *Dean, supra* note 20.

Sanders also testified that after Mainelli's death, Myers told him that Myers got Mainelli to walk into her bedroom, take off her clothes, and lie on the bed where Myers shot her once the lights were out. Wilson's sister testified that Myers told her to tell the police he was with her at the time of the killing. This evidence presented at trial showing Myers was at the apartment with a handgun matching the one used in Mainelli's shooting is overwhelming.

[8,9] Myers' argument that testing will produce results which contradict this testimony and evidence and show he was not present at Mainelli's apartment is not persuasive. DNA evidence is not a videotape of a crime, and the nonpresence of an individual's DNA profile in a biological sample does not preclude that individual from having been present or in possession of the item tested.[31] Instead, such results would merely show the individual's DNA was not present in the specific biological sample tested.[32] It would be mere speculation to conclude that the absence of Myers' DNA on the apartment items, gun, and ammunition excludes him from having been at Mainelli's apartment the night of the shooting. This is so particularly in view of the persuasive evidence of his presence at the apartment and possession of the handgun the night of the murder.

Additionally, assuming the DNA testing would show other individuals' biological samples were present in Mainelli's apartment, such results are consistent with the State's evidence and arguments presented at trial. It is likely testing evidence from Mainelli's apartment would indicate other individuals had been at the apartment. However, evidence received during Myers' trial already established other individuals had been present at Mainelli's apartment prior to her death. Specifically, testimony confirmed that the other individuals who had access to Mainelli's apartment included Mainelli's roommate, that

---

[31] See, id.; Lotter, supra note 25.

[32] See id.

other individuals were present in the apartment the night of Mainelli's death, and that Mainelli had numerous boyfriends at the time of her death. Additionally, fingerprints of other men were found at Mainelli's apartment. Myers' trial counsel noted this evidence and placed emphasis on these other individuals' access and the fact that Myers' fingerprints were not found at the scene while other individuals' fingerprints were. Accordingly, the requested DNA testing based upon Myers' claims that it would show other individuals' biological presence in Mainelli's apartment would not produce exculpatory evidence.

As to the sexual assault kit, Myers argues that DNA testing would contradict the State's theory that he had sex with Mainelli prior to her murder. However, as the district court correctly noted, the State did not argue Myers had sex with Mainelli prior to killing her and the State's witnesses did not allege he did so. Instead, the testimony received was that Myers told others he was willing to be intimate with Mainelli in pursuit of his plan to keep her quiet. Sanders testified that prior to Mainelli's death, Myers told him Mainelli needed to be shot, and that Myers said he was willing to have sex with her in pursuit of that goal. Sanders testified that after Mainelli's death, Myers told him Mainelli walked into her bedroom, took off her clothes, and lay on the bed and that Myers "acted like he was about to have sex with her or something" and shot her once the lights were out.

The State used this testimony in opening statements to allege that "[Myers] convinced [Mainelli] to have sex with him; and that when she had laid down in the bed, he got next to her and shot her in the temple, and she was still moving so he shot her in the temple again." Similarly, in closing arguments, the prosecutor summarized: "She took off her clothes; she laid on the bed. He put the gun towards her temple and he shot her." The lack of Myers' biological presence in Mainelli's sexual assault kit would be consistent with the State's theory of the case and the testimony received at trial. As such, the

requested testing of the sexual assault kit would fail to produce exculpatory evidence.

Because the requested testing would fail to lead to non-cumulative exculpatory evidence as determined above, the district court did not err in finding Myers' request for DNA testing did not meet the requirements of § 29-4120(5)(c) and in denying Myers' motion.

## Declining to Appoint Counsel

Under the DNA Testing Act, a court shall appoint counsel for an indigent person upon a showing that DNA testing may be relevant to the person's claim of wrongful conviction.[33] In similar cases where we affirmed findings that the requested testing would not produce noncumulative exculpatory evidence, we applied that finding to determine the applicants failed to show the DNA testing was relevant to the wrongful conviction claims.[34] For the reasons discussed above, Myers did not make the requisite showing that DNA testing may be relevant to his claim of wrongful conviction and the district court, therefore, did not abuse its discretion in denying his request for appointment of counsel.

## Failing to Determine State
## Withheld Evidence

[10] Myers also assigns the district court erred in failing to determine whether the State refused to allow Myers access to the sexual assault kit. We addressed this assignment of error in our decision after remand on the initial denial of Myers' motion for DNA testing and held the district court need not consider this argument further because such a claim is not part of the DNA Testing Act framework.[35] As a result, whether the prosecution improperly withheld evidence is not properly

---

[33] § 29-4122.

[34] See, *Phelps, supra* note 14; *Dean, supra* note 20.

[35] *Myers, supra* note 3.

presented in a motion for DNA testing.[36] Therefore, this assignment of error is without merit.

## CONCLUSION

The DNA testing requested by Myers would not result in noncumulative exculpatory evidence relevant to his wrongful conviction claim. We therefore affirm the district court's denial of Myers' motion for DNA testing and motion for appointment of counsel.

Affirmed.

Freudenberg, J., not participating.

─────────────

[36] *Id.*