Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/30/2020 08:08 AM CDT

State of Nebraska, appellee, v.
Terrance J. Hale, appellant.
___ N.W.2d ___

Filed August 7, 2020.    No. S-19-1109.

1. **DNA Testing: Appeal and Error.** A motion for DNA testing is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.

2. \_\_\_\_: \_\_\_\_. An appellate court will uphold a trial court's findings of fact related to a motion for DNA testing unless such findings are clearly erroneous.

3. **DNA Testing.** The DNA Testing Act is a limited remedy providing inmates an opportunity to obtain DNA testing in order to establish innocence after a conviction.

4. \_\_\_\_. Pursuant to the DNA Testing Act, a person in custody takes the first step toward obtaining possible relief by filing a motion in the court that entered the judgment requesting forensic DNA testing of biological material.

5. \_\_\_\_. The court has discretion to either consider a motion for DNA testing on affidavits or hold a hearing.

6. \_\_\_\_. If the criteria in Neb. Rev. Stat. § 29-4120(1) (Reissue 2016) are met, and the reviewing court finds that testing may produce noncumulative, exculpatory evidence relevant to the claim that the person was wrongfully convicted or sentenced under § 29-4120(5), the court must order DNA testing.

7. \_\_\_\_. A court is not required to order DNA testing if such testing would not produce exculpatory evidence.

8. **DNA Testing: Proof.** Part of the defendant's burden of proof is to provide the court with affidavits or evidence at a hearing establishing that DNA testing may produce noncumulative, exculpatory evidence relevant to the claim that he or she was wrongfully convicted or sentenced.

9. **DNA Testing.** The threshold showing required under Neb. Rev. Stat. § 29-4120(5) (Reissue 2016) is relatively undemanding and will

generally preclude testing only where the evidence at issue would have no bearing on the guilt or culpability of the movant.

10. ____. The function of testing DNA evidence is to determine whether the sample being examined contains genetic characteristics similar to a sample from a known individual.

Appeal from the District Court for Douglas County: Leigh Ann Retelsdorf, Judge. Affirmed.

Terrance J. Hale, pro se.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ.

Heavican, C.J.

## INTRODUCTION

Terrance J. Hale appeals the district court's denial of his postconviction motion for DNA testing under Nebraska's DNA Testing Act.[1] Hale asserts that the district court erred in denying his motion by concluding that DNA testing would not result in noncumulative, exculpatory evidence. We affirm.

## FACTS

### Background

Hale was convicted by jury of first degree murder and sentenced to life imprisonment for killing Raymond Vasholz. Raymond died after inhaling smoke from a fire set in his house in Omaha, Nebraska. Raymond's wife, Elizabeth Vasholz, who was 76 years old at the time of the fire, testified that Hale had broken into the couple's house, demanded money, and assaulted both her and Raymond before starting the fire. In 2015, Hale's conviction was affirmed by this court on direct

---

[1] Neb. Rev. Stat. § 29-4116 et seq. (Reissue 2016 & Cum. Supp. 2018).

appeal in *State v. Hale*.[2] The following facts are taken from that opinion:

Elizabeth testified that on February 7, 2013, in the time "'leading up to 9 o'clock a.m.,'" she was sitting in the living room with Raymond when she heard "'[b]reaking glass'" that "'sounded like it was coming from the basement.'"[3] Elizabeth testified that a man wearing a coat, whom Elizabeth identified in court as Hale, came rushing up the basement stairs. Elizabeth testified that she recognized Hale because he had done yard-work for her, but she did not know him by name.

Elizabeth testified that after Hale came up the stairs, he demanded money. After replying that she had no money, Elizabeth said that Hale assaulted her and Raymond. Elizabeth reported striking Hale's back with a lamp as Hale was hitting Raymond. Elizabeth testified that Hale grabbed "'a paper'" and lit it, using the gas stove.[4] Elizabeth said that Hale threw the lit paper at her and then set a couch cushion on fire and came toward her, pushing the burning cushion against her arms.

Elizabeth testified that she escaped the house, grabbing a recycling bin to cover herself because Hale had torn off the pajama top she had been wearing. Elizabeth recalled knocking on her neighbor's door, but no one answered so she sat on her neighbor's porch and began screaming.

Elizabeth stated that Hale then came outside and "'threw his coat down.'"[5] Then another man arrived, and Elizabeth asked him for help. Elizabeth testified that she suffered a cracked vertebrae and burns on her back and both arms.

Gary Burns testified that he had been driving in his car at approximately 9 a.m. when he saw an elderly woman sitting outside. Burns said that the woman, who was "'real dingy and dirty'" and looked like "'she had been beat up, basically,'"

---

[2] *State v. Hale*, 290 Neb. 70, 858 N.W.2d 543 (2015).

[3] *Id.* at 72, 858 N.W.2d at 545.

[4] *Id.*

[5] *Id.* at 72, 858 N.W.2d at 546.

had no shirt on and was covering herself with a recycling bin.[6] The woman was yelling, "'"Help, help, help."'"[7]

Burns also saw a man, whom he identified in court as Hale, about 15 feet away from the woman. Burns got out of his car and called the 911 emergency dispatch service to report an assault. As he approached the woman, Burns testified that she pointed at Hale and said, "'"You did this, you did it."'"[8] According to Burns, Hale threw up his arms and said, "'"I didn't do this."'"[9]

Firefighters responded to an alarm for a house fire at 9:12 a.m. Smoke was escaping from the house when they arrived. Inside, they found "'pockets of fire'" that they quickly extinguished.[10] At that time, Elizabeth was seated on the neighbor's front porch with a coat draped over her shoulders. The firefighters located Raymond lying across a bed in one of the bedrooms. He was not breathing. Raymond was transported to a hospital, where he was pronounced dead later that afternoon.

Police officer Roger Oseka testified that when he and another officer reached the scene, he saw Elizabeth sitting on the front porch of a neighbor's house. Oseka also saw a black man, whom he identified in court as Hale, "'walking in circles'" and saying, "'"I was trying to save them."'"[11]

Oseka exited his cruiser and approached Elizabeth, whom he said was bleeding from her nose and mouth and had "'burn sores'" on both arms.[12] After Oseka made contact with Elizabeth, she pointed at Hale and said, "'"He did it."'"[13] Oseka then directed the other officer to arrest Hale.

---

[6] *Id.*

[7] *Id.*

[8] *Id.* at 73, 858 N.W.2d at 546.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

A coroner's physician, who performed an autopsy on Raymond's body, opined that Raymond's death was caused by "'the complication of breathing smoke, soot, carbon monoxide, and the other hot gasses in the fire, [and] being burned by the fire.'"[14] The autopsy also showed numerous abrasions, lacerations, and bruises on Raymond's body.

A fire investigator examined the house and identified six different points of origin of the fire, each independent of the other. He also found a couch cushion with "'thermal damage.'"[15] He opined that the fire was set intentionally, based on the multiple points of origin and no indication that they would have naturally spread from one to another. He testified that his conclusions were consistent with Elizabeth's description of events.

Inside, the house showed signs of a violent struggle. Firefighters saw what appeared to be streaks of blood on a refrigerator in the kitchen. Photographs of the house showed apparent blood on the leg of an upturned table, a windowsill in the room where Raymond was found, an exterior door, and the wall leading to the basement. Apparent blood was also documented on the sleeve and lining of the coat and on the recycling bin. Additionally, a pane in a basement window was broken and the latch used to open the window was bent. A handprint was pressed into the dirt outside the window.

Photographs of Hale after his arrest show a small cut on his nose, a scratch on his right arm, a small cut on his right leg, and scrapes or lacerations on his back.

A forensic DNA analysis was performed on several items retrieved from the scene. Blood on the left chest area and left sleeve of the coat generated a genetic profile matching Elizabeth's. Hale's DNA profile was consistent with blood on the right sleeve of the coat. The probability of an unrelated African American individual matching the profile is 1 in 6.35 quintillion.

---

[14] *Id.* at 75, 858 N.W.2d at 547.

[15] *Id.*

Hale did not testify, but the State played for the jury several recordings of his statements. In a statement to police, Hale said that he "'tried to save this lady.'"[16] Hale said that he was walking near the Vasholzes' house when he saw smoke. Because the doors of the house were locked, Hale said that he kicked in a basement window and pulled Elizabeth from the house.

Four days after Raymond's death, Hale sat for an interview with local media. During the interview, Hale said that he was walking to a bus stop when he saw smoke rising from the Vasholzes' house. Hale said that he opened a door and saw an older woman that he recognized as a neighbor. Hale pulled her out of the house and went back for her husband when somebody attacked him from behind. Hale said that he went to the basement, broke a window, climbed out, called 911, and waited for police to arrive. Hale said that he covered the woman with his coat, but she told him to get away. Hale claimed that the police caused the laceration to his nose when they took him into custody.

Hale was charged with one count of first degree murder under Neb. Rev. Stat. § 28-303(2) (Reissue 2008). The information alleged that Hale killed Raymond while committing, or attempting to commit, a robbery, burglary, or arson.

A jury convicted Hale, and the court sentenced him to life imprisonment.

## Motion for DNA Testing

On March 29, 2019, Hale filed a motion for DNA testing pursuant to the DNA Testing Act. In his motion, Hale requested DNA testing of four swabs of apparent blood taken from the Vasholzes' house and a buccal swab obtained from Eugene McMiller, an individual that had been observed in the area. The swabs of apparent blood were collected from (1) the east basement stairs wall, (2) a windowsill and window latch

---

[16] *Id.* at 76, 858 N.W.2d at 548.

in the Vasholzes' bedroom, and (3) the lowest concrete exterior step of the neighbor's porch where Elizabeth was found. Hale did not submit affidavits in support of his motion.

The State filed a response and an inventory of evidence showing that the requested swabs were located in a freezer at the Omaha Police Department, but the buccal swab obtained from McMiller had been destroyed in 2014.

On October 28, 2019, the district court entered an order denying Hale's motion for DNA testing after finding that the requested testing would not produce noncumulative, exculpatory evidence relevant to the claim that Hale was wrongfully convicted or sentenced. Citing this court's opinion in *State v. Dean*,[17] the district court concluded that even if Hale were excluded as being the contributor to the blood swabs on which he sought testing, he would not be exonerated because Elizabeth immediately identified Hale as the attacker, Hale stated that he had been inside the house attempting to assist the Vasholzes during the fire, Hale's DNA was found on a coat located at the scene, and Hale was observed to have scratches on his person.

## ASSIGNMENT OF ERROR

Hale assigns that the district court erred in denying his motion for DNA testing.

## STANDARD OF REVIEW

[1,2] A motion for DNA testing is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.[18] An appellate court will uphold a trial court's findings of fact related to a motion for DNA testing unless such findings are clearly erroneous.[19]

---

[17] *State v. Dean*, 270 Neb. 972, 708 N.W.2d 640 (2006).

[18] *State v. Myers*, 304 Neb. 789, 937 N.W.2d 181 (2020).

[19] *Id.*

ANALYSIS

[3-5] The DNA Testing Act is a limited remedy providing inmates an opportunity to obtain DNA testing in order to establish innocence after a conviction.[20] Pursuant to the act, a person in custody takes the first step toward obtaining possible relief by filing a motion in the court that entered the judgment requesting forensic DNA testing of biological material.[21] The court has discretion to either consider the motion on affidavits or hold a hearing.[22] Under § 29-4120(1), an inmate may only request DNA testing of biological material that

    (a) Is related to the investigation or prosecution that resulted in such judgment;

    (b) Is in the actual or constructive possession or control of the state or is in the possession or control of others under circumstances likely to safeguard the integrity of the biological material's original physical composition; and

    (c) Was not previously subjected to DNA testing or can be subjected to retesting with more current DNA techniques that provide a reasonable likelihood of more accurate and probative results.

[6] If the criteria in § 29-4120(1) are met, and the reviewing court finds that "testing may produce noncumulative, exculpatory evidence relevant to the claim that the person was wrongfully convicted or sentenced" under § 29-4120(5), the court must order DNA testing.[23]

[7,8] A court is not required to order DNA testing if such testing would not produce exculpatory evidence.[24] The DNA Testing Act defines exculpatory evidence as evidence "which

---

[20] *State v. Betancourt-Garcia*, 299 Neb. 775, 910 N.W.2d 164 (2018).

[21] *Id.*

[22] *Id.*

[23] See, *State v. Amaya*, 305 Neb. 36, 938 N.W.2d 346 (2020); *State v. Myers, supra* note 18.

[24] See *State v. Ildefonso*, 304 Neb. 711, 936 N.W.2d 348 (2019).

is favorable to the person in custody and material to the issue of the guilt of the person in custody."[25] Part of the defendant's burden of proof is to provide the court with affidavits or evidence at a hearing establishing that DNA testing may produce noncumulative, exculpatory evidence relevant to the claim that he or she was wrongfully convicted or sentenced.[26]

It is undisputed in this case that the swabs of apparent blood Hale sought to be tested satisfy the criteria set forth in § 29-4120(1); nor is it disputed that the buccal swab obtained from McMiller does not. Because the buccal swab obtained from McMiller was destroyed in 2014, it is no longer in the actual or constructive possession or control of the State or others as required by § 29-4120(1)(b). Thus, the sole issue in this appeal is whether the district court abused its discretion in concluding that DNA testing on the requested swabs of apparent blood would not produce noncumulative, exculpatory evidence relevant to Hale's claim that he was wrongfully convicted.

[9] This court has recognized that the threshold showing required under § 29-4120(5) is "'relatively undemanding . . . and will generally preclude testing only where the evidence at issue would have no bearing on the guilt or culpability of the movant.'"[27] Nevertheless, we conclude that Hale has failed to meet the threshold requirement for DNA testing.

On appeal, Hale contends the district court erred in denying his motion because "[i]f DNA testing provides results that another individual's DNA is present on the crime scene(which [sic] is likely to have been left by the killer) this is exculpatory evidence as defined by Neb. Rev. Stat. §29-4119."[28] Hale further asserts that even if he were placed at the scene of the crime, DNA test results on the swabs of apparent blood may produce a match to a possible suspect and thus exculpate

---

[25] § 29-4119.

[26] See *State v. Ildefonso, supra* note 24.

[27] See *id.* at 717, 936 N.W.2d at 352 (quoting *State v. Buckman*, 267 Neb. 505, 675 N.W.2d 372 (2004)).

[28] Brief for appellant at 8.

Hale as the actual killer. Hale also argues that DNA testing could be favorable to him and relevant to his claim of wrongful conviction by raising doubt regarding the veracity of testimony produced at trial. However, Hale produced no affidavits in support of his motion for DNA testing, and he provides only conclusory statements in support of his claims on appeal.

In his motion for DNA testing, Hale argued that the blood found on the basement stairs wall and on the windowsill and window latch in the Vasholzes' bedroom could only be from the attacker and that a finding the blood did not come from Hale would prove his innocence. We rejected a similar argument in *Dean*.[29]

In *Dean*, the defendant, JaRon Dean, had been convicted of murder and had filed a postconviction motion for DNA testing of the firearm and ammunition used in the commission of the offense. Dean claimed that if DNA testing were conducted, it would "'not produce any biological material associated with him'" and thus would prove that he was "'not the shooter and had nothing whatsoever to do with the [crime].'"[30] Recognizing that the evidence presented at trial demonstrated Dean had possessed the firearm, we determined that even if Dean was correct and DNA testing would not have detected the presence of his DNA on the objects in question, the result would be at best inconclusive, and certainly not exculpatory. We stated:

> [E]ven assuming a biological sample did exist and that Dean's DNA was absent from that sample, on the record before us, it would be mere speculation to conclude that the absence of Dean's DNA on the firearm and ammunition would exclude him as being the person who fired the fatal shot. This is particularly so in view of the persuasive and undisputed trial evidence to the contrary.[31]

---

[29] *State v. Dean, supra* note 17.

[30] *Id.* at 973, 708 N.W.2d at 642.

[31] *Id.* at 976, 708 N.W.2d at 645.

Similarly, in *State v. Myers*,[32] we affirmed the denial of the request by the defendant, James Myers, for postconviction DNA testing after his murder conviction. In that case, Myers requested testing on items of evidence taken from the scene of the crime, the victim's apartment. Myers claimed that his DNA would not be found on any of the items and that the test results would show there were other individuals present in the victim's apartment. Myers also argued the test results would call into question the credibility of the witnesses who had testified against him. Recognizing the "overwhelming" evidence presented at trial showing Myers was present at the victim's apartment with a handgun matching the one used in the killing, we determined DNA testing would fail to lead to noncumulative, exculpatory evidence.[33] We concluded:

> Myers' argument that testing will produce results which contradict this testimony and evidence and show he was not present at [the victim's] apartment is not persuasive. DNA evidence is not a videotape of a crime, and the nonpresence of an individual's DNA profile in a biological sample does not preclude that individual from having been present or in possession of the item tested. Instead, such results would merely show the individual's DNA was not present in the specific biological sample tested. It would be mere speculation to conclude that the absence of Myers' DNA on the apartment items, gun, and ammunition excludes him from having been at [the victim's] apartment the night of the shooting. This is so particularly in view of the persuasive evidence of his presence at the apartment and possession of the handgun the night of the murder.[34]

This court has previously held that DNA testing of semen samples recovered from the scene of a sexual assault and

---

[32] *State v. Myers, supra* note 18.

[33] *Id.* at 800, 937 N.W.2d at 188.

[34] *Id.* at 800, 937 N.W.2d at 188-89.

murder that may exclude two codefendants as contributors would result in noncumulative, exculpatory evidence. In *State v. White*,[35] three of the accomplices of the defendant, Joseph White, had testified that they had observed only White and codefendant Thomas Winslow sexually assault the victim. White's defense at trial was that he was not present at the scene of the crime and that he was convicted despite testimony indicating the biological evidence recovered from the scene could not be tied to him.

In denying White's motion for DNA testing, the district court characterized White's argument as a claim that DNA test results excluding him as a contributor could establish that he was not present and did not participate in the crime. Reversing the district court's denial, we concluded that if DNA testing excluded both of the codefendants as contributors to the semen samples, the results would raise serious doubts regarding the credibility of the three accomplices that testified *only* White and Winslow had carried out the sexual assault. Recognizing this testimony was the "heart of the State's case" and critical to White's conviction, we concluded that evidence excluding both White and Winslow as contributors would be favorable to White and material to the issue of White's guilt and, therefore, "'exculpatory'" under § 29-4119.[36]

The case before us does not present similar facts. There was persuasive evidence demonstrating that Hale was the assailant. Elizabeth immediately identified Hale as the individual that attacked her, he had injuries that were consistent with Elizabeth's account of the attack, and other than Hale's uncorroborated statement made during the media interview, there was no evidence to suggest that anyone other than Hale and the Vasholzes were inside the residence.

Hale did not mention his alleged attacker at the scene or when he was interviewed by police later that afternoon. The first time Hale brought up the possibility of another intruder

---

[35] *State v. White*, 274 Neb. 419, 740 N.W.2d 801 (2007).

[36] *Id.* at 425, 740 N.W.2d at 806.

was during the media interview 4 days later. In the interview, Hale admitted to being inside the Vasholzes' residence and claimed he had been attacked from behind before going to the basement and breaking a window. Thus, assuming Hale could be excluded as a contributor to any DNA found on the wall leading to the basement, the exclusion would contradict Hale's own statements.

In his brief on appeal, Hale contends that DNA testing of the items requested may produce a match to a possible suspect. However, Hale provides no factual basis for this claim, nor does he indicate a sample of DNA in the State's possession with which to compare any results.

In *State v. Ildefonso*,[37] the defendant who had been convicted of first degree murder, Arlyn Ildefonso, sought DNA testing of numerous items of evidence collected during the investigation, including clothing, a syringe, blood swabs, and a possible piece of human tissue. Ildefonso argued that DNA test results would exclude him as a contributor and instead contain the DNA of the real killer. He also maintained that he had been framed for the murder and that testing showing the DNA of three individuals that had initially been implicated in the murder would raise serious doubts regarding the testimony of eyewitnesses that had been with Ildefonso at the time of the murder. In denying his motion for DNA testing, the district court stated that Ildefonso "'does not indicate with any particularity, or truthful corroborating evidence, why testing of those items may present any exculpatory evidence relative to the claim that the defendant was wrongfully convicted—only hopeful conclusions.'"[38]

Affirming the district court's ruling, this court concluded that the absence of Ildefonso's DNA on some of the items would be consistent with the evidence and would not be exculpatory, particularly in light of the eyewitness testimony presented against him at trial and Ildefonso's possession of

[37] *State v. Ildefonso, supra* note 24.

[38] *Id.* at 715-16, 936 N.W.2d at 351.

the murder weapon at the time he was arrested. Pointedly, we also noted that it was a problem for Ildefonso that the State's index of property did not show that the State had actual or constructive possession of a DNA sample of the three individuals with which to compare any testing results.

[10] In the present case, without a known sample with which to compare the results, the lack of Hale's DNA in the swabs of apparent blood would be inconclusive at best. We have explained:

> The function of testing DNA evidence is to determine whether the sample being examined contains genetic characteristics similar to a sample from a known individual. There are two possible outcomes when comparing the samples. If the DNA test results from the samples match, i.e., the same DNA types are found at all loci tested from both samples, then the conclusion is that the sample from the known individual cannot be excluded as a possible source of the sample in question. If, on the other hand, the genetic information present in the DNA from the known individual is not present in the DNA from the sample being tested, then the DNA profiles do not match and the known individual is excluded as the source of the DNA sample in question.[39]

In this case, Hale does not provide any evidence or specificity in regard to his claim that DNA testing will identify the actual attacker. And even if Hale's DNA was not detected in the swabs of apparent blood, the results would not be exculpatory in light of the evidence presented at trial. Based on such results, it would be mere speculation to conclude that Hale was not the assailant.

In regard to the apparent blood found on the lowest concrete exterior step of the neighbor's porch, Hale argued in his motion that testing would find the presence of his DNA. He asserted that the presence of his DNA would show that he had been cut while leaving through the basement window of the

---

[39] *State v. Lotter*, 266 Neb. 758, 770, 669 N.W.2d 438, 447 (2003).

Vasholzes' house after the attack, because blood had leaked from the cut when he was standing on the steps speaking to the police. However, the uncontroverted evidence presented at trial shows that Hale never spoke to law enforcement while on the concrete steps.

Oseka testified that he was the first law enforcement officer on scene and that Hale was located in the grassy area between the sidewalk and the street when he arrived. Oseka stated that he and another officer apprehended Hale in this grassy area and secured him in the police cruiser after Elizabeth pointed at Hale and said, "'"He did it."'"[40] Oseka's testimony was corroborated by Burns, who testified that he observed the officers take Hale into custody in the grassy area.

The laceration on Hale's nose is consistent with Elizabeth's version of the attack. Elizabeth testified that she heard breaking glass coming from the basement just before Hale rushed up the stairs and attacked her and Raymond. Moreover, Hale's claim that his nose was injured while exiting the house contradicts his statement made during the media interview, in which he stated that the injury to his nose occurred when police took him into custody.

We conclude the district court did not err in finding that Hale's request for DNA testing did not satisfy the requirements of § 29-4120(5)(c) and in denying Hale's motion.

## CONCLUSION

Hale did not meet his burden of showing that DNA testing may produce noncumulative, exculpatory evidence relevant to his claim that he was wrongfully convicted. Accordingly, we conclude that the district court did not abuse its discretion in denying Hale's motion for DNA testing.

AFFIRMED.

FREUDENBERG, J., not participating.

---

[40] *State v. Hale, supra* note 2, 290 Neb. at 73, 858 N.W.2d at 546.