Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/27/2021 08:10 AM CDT

State of Nebraska, appellee, v.
Steven Jacob, appellant.

___ N.W.2d ___

Filed June 4, 2021.    No. S-20-584.

1. **DNA Testing: Appeal and Error.** A motion for DNA testing is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.

2. \_\_\_\_: \_\_\_\_. An appellate court will uphold a trial court's findings of fact related to a motion for DNA testing unless such findings are clearly erroneous.

3. \_\_\_\_: \_\_\_\_. Decisions regarding appointment of counsel under the DNA Testing Act are reviewed for an abuse of discretion.

4. **Judgments: Appeal and Error.** An appellate court reviews a denial of a motion to alter or amend the judgment for an abuse of discretion.

5. **DNA Testing.** Nebraska's DNA Testing Act is a limited remedy providing inmates an opportunity to obtain DNA testing in order to establish innocence after a conviction.

6. \_\_\_\_. If the criteria set forth in Neb. Rev. Stat. § 29-4120(1) (Reissue 2016) are met and if the court further determines that the requirements of § 29-4120(5) have been met, then the court must order testing.

7. **DNA Testing: Evidence.** The requirement that the requested DNA testing produce noncumulative exculpatory evidence is relatively undemanding for a movant seeking DNA testing and will generally preclude testing only where the evidence at issue would have no bearing on the guilt or culpability of the movant.

8. **DNA Testing.** The nonpresence of an individual's DNA profile in a biological sample does not preclude that individual from having been present or in possession of the item tested.

9. \_\_\_\_. The nonpresence of an individual's DNA profile in a biological sample merely shows the individual's DNA was not present in the specific biological sample tested.

10. **DNA Testing: Evidence.** DNA evidence is not a videotape of a crime, and testing only shows whether the biological sample in question belonged to the person tested against.

Appeal from the District Court for Lancaster County: Darla S. Ideus, Judge. Affirmed.

Steven Jacob, pro se.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

Miller-Lerman, Cassel, Funke, and Papik, JJ.

Funke, J.

Steven Jacob appeals the district court's denial of his motion for testing under Nebraska's DNA Testing Act[1] and his motion for the appointment of counsel. Jacob argues the district court erred in denying his motion by determining the requested testing would not exonerate Jacob nor would it prove that he was not the shooter. We affirm.

## BACKGROUND

Jacob was convicted of murder in both the first and second degrees and of using a firearm to commit those crimes in connection with the 1989 shooting deaths of Melody Hopper and James Etherton.[2] In 1988, Jacob was dating Hopper. However, after the relationship deteriorated, Hopper began dating Etherton and moved into Etherton's house. On August 1, 1989, Hopper advised her work supervisor that before leaving her house that morning, Hopper heard the door handle rattle and the doorbell ring. When Hopper opened the door, Jacob entered the house uninvited and stated that he wanted to talk about getting back together. When Hopper told Jacob that she

---

[1] Neb. Rev. Stat. § 29-4116 et seq. (Reissue 2016).

[2] See *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998), *abrogated on other grounds, State v. Nolan*, 283 Neb. 50, 807 N.W.2d 520 (2012).

was not interested, Jacob told her that he at least wanted to talk and that if she would not do that, he might do something drastic. Hopper had to physically shove Jacob out of the house to get him to leave.

John Ingram was a coworker of Etherton and rented a basement bedroom from him. On August 2, 1989, at approximately 3:45 a.m., Ingram woke up to use the bathroom. As he walked out of his bedroom, he saw glass on the floor by the back door and heard the floor above him creak. He realized someone was in the house, so he retrieved his .22-caliber pistol. When he returned to the basement stairway, he heard three gunshots, a woman scream twice, then three or four more gunshots. After the last gunshot, Ingram heard a shell casing roll around upstairs and a thump on the floor above him. Fearing someone had been shot, Ingram ran out the back door and down the block. He went to a house he believed was owned by a fire marshal. When the door was answered, Ingram stated that someone had been shot and "they had emptied a clip on them."

At approximately 4 a.m., two officers arrived at Etherton's house. They discovered that the back, basement screen door had been propped open with a rock and that the glass on the inner door was broken. One of the officers also observed a storm window on the ground that had been removed, which was later found to contain Jacob's fingerprints. In a hallway near the upstairs bedroom, the officers found Etherton's body with three gunshot wounds in it. The officers then heard a faint cry from the bedroom, where they found Hopper suffering from two gunshot wounds. Hopper died several days later.

Upon further investigation, the officers found six shell casings and one live round in the house. All casings were from fired 9-mm bullets and fired from the same weapon. The live round was also a 9-mm cartridge. Jacob's father testified that Jacob owned a 9-mm pistol. Additionally, Jacob testified that he had owned a 9-mm Llama pistol. However, the pistol was never recovered. A four-page letter written by Jacob to Etherton

was also found in the bedroom. Jacob testified that the letter, dated July 9, 1989, was written to explain a comment he made about Etherton's being responsible for Hopper. Jacob ended the letter by stating that he hoped Etherton would "be happy and more successful [with Hopper] than [he had] been."

At trial, Ingram testified that while waiting for police, he saw a light-colored car drive by. He described the driver as having a receding hairline, glasses, a mustache, and dark hair. When he saw a picture of Jacob on the news the next day, he recognized Jacob as the driver of the car and identified him to the police the following day.

Jacob claimed that he left for a vacation on August 1, 1989, and drove to Minnesota, South Dakota, North Dakota, and then to Canada. Evidence showed that on August 9, Jacob bought a plane ticket from Canada to England. However, due to various unforeseen events, Jacob ended up in Maine and bought a plane ticket to Boston. Jacob was arrested on August 10 in Maine, when he attempted to sell his van at a used-car dealership.

Jake Faulkerson, who shared a cellblock with Jacob for a brief time in September 1989, testified that Jacob told him that he "was not going to end up doing a minute on his time . . . because he didn't leave any witnesses." Jacob also allegedly told Faulkerson, "I shot him first so the bitch could see what she had coming."

Jacob was convicted for the double homicide. However, on appeal, this court determined that the district court erroneously admitted into evidence statements Hopper made in the hospital declaring Jacob to be her assailant, and it reversed, and remanded for a new trial.[3] Upon retrial, Jacob was convicted for the double homicide and sentenced to two terms of life imprisonment and two terms of not less than 6 years 8 months nor more than 20 years' imprisonment, all to be served consecutively. On appeal, Jacob's convictions and sentences were affirmed by this court.

---

[3] See *State v. Jacob*, 242 Neb. 176, 494 N.W.2d 109 (1993).

### MOTION FOR DNA TESTING

In 2019, Jacob filed a motion for DNA testing on two types of evidence found at the crime scene: (1) the six shell casings and one unfired cartridge and (2) potential biological evidence recovered from the living room. In 1989, four "slugs" were sent for DNA testing. There was no blood detected on the slug found in the hallway next to Etherton's body. Additionally, although there was blood present on three other slugs found on the bed, under the bed, and behind the headboard, there were insufficient amounts of blood on each slug for DNA testing. Jacob argued that with current methods of retrieving DNA from shell casings, the DNA on the slugs could "identify who took and loaded the firearm from [his] office" and is exculpatory because it "shows the Llama 9mm handgun used in the shooting was NOT in [his possession] at the time of and preceeding [sic] the shooting."

According to Jacob, it was Hopper alone, or Hopper and Etherton together, who took Jacob's gun and car that night. Jacob argues that although his gun could hold up to eight cartridges, he only kept four cartridges in the clip while it was "being stored for a long time." Therefore, Jacob contended, because the police found six spent cartridges and one unfired cartridge at the crime scene, whoever took the handgun would have had to load more cartridges into it. Thus, according to Jacob, that person's DNA could be present on the slugs found by the police.

A gauze sample from a "'spot in [the] living room'" was also sent for DNA testing in 1989. However, no blood was found on the gauze. Referencing the testimony of Etherton's son, the testimony of Ingram, and the "'Nurse's Notes'" from Hopper's stay in the hospital, Jacob developed a theory that the stain found on the living room carpet was present prior to the shooting. Jacob claimed Hopper and Etherton were having sexual intercourse while Hopper was menstruating, which would explain why Hopper's and Etherton's DNA would be on the floor. Jacob also argued Etherton was a "violently jealous man"

who forced himself upon Hopper, giving Hopper a motive to shoot Etherton.

The district court entered an order requiring the State to take such steps as necessary to ensure the items were secure and to prepare an inventory confirming the items were in the State's possession. The State subsequently filed the inventory of evidence confirming the items Jacob wished to have tested were in the State's possession.

On October 17, 2019, Jacob filed a motion to be appointed counsel and to proceed in forma pauperis. The court deferred ruling on the motion for counsel, deciding that the motion was premature. Then, on October 24, the State filed a motion to deny DNA testing. In its motion, the State alleged that Jacob failed to meet his burden under § 29-4120(5)(c), because the requested DNA testing would only produce cumulative evidence that is irrelevant to the claim that Jacob was wrongfully convicted or sentenced. This was followed by an objection filed by Jacob on November 4. In his objection, Jacob clarified his theory regarding what happened by asserting that after Hopper shot Etherton, Ingram took the gun from Hopper, shot Hopper, and then removed the gun from the house. Jacob further asserted it was Ingram who threw a rock through the window to make it look like a home invasion. On November 7, a hearing was held on the State's motion to deny DNA testing. At the hearing, counsel for the State referenced the bill of exceptions from Jacob's second murder trial:

> Judge, I did have the original Bill of Exceptions from the second trial brought in. I just reference those and those are not part of the record, I realize that. But in particular, I also had brought in the portion of the Bill of Exceptions from the first trial dealing with the exhibits that . . . Jacob wanted to have DNA tests run on; in particular, that would be the shell casings and the cartridge that was found. And the reason I brought that volume in, judge, and if I may, that is Volume VIII of the original trial of the first trial

involving . . . Jacob in this double homicide. And in that
trial, they offered those items for the jury.

On March 11, 2020, the district court entered an order deny-
ing Jacob's motion for DNA testing and granting the State's
motion to deny DNA testing. The court defined exculpatory
evidence as "evidence favorable to the person in custody
and material to the issue of the person's guilt" and cited our
decision in *State v. Buckman*,[4] where we explained that "this
requirement is relatively undemanding . . . and will generally
preclude testing only where the evidence at issue would have
no bearing on the guilt or culpability of the movant." The court
further explained that despite this low threshold, DNA testing
is not required if such testing would not produce exculpa-
tory evidence.

The district court compared the facts of Jacob's case to
similar fact patterns in *State v. Myers*,[5] *State v. Dean*,[6] and
*State v. Lotter*,[7] and held that like those cases, the absence of
Jacob's DNA from the shell casings or live round would be, at
best, inconclusive and not exculpatory. The court determined
that such DNA testing would not prove that Jacob was not in
possession of the gun at the time of the shooting. The court
found that the presence of DNA from Hopper, Etherton, or
Ingram would not be exculpatory, because all three individ-
uals lived at the home where the crime was committed. The
court concluded that even if it were to assume that Jacob's
DNA was absent from the items Jacob requested to be tested,
or that the DNA of Hopper, Etherton, or Ingram were present
on those items, it would be mere speculation to conclude that
this would exonerate Jacob from being the person who fired
the shots. The district court ultimately denied Jacob's motion

---

[4] *State v. Buckman*, 267 Neb. 505, 515, 675 N.W.2d 372, 381 (2004).

[5] *State v. Myers*, 304 Neb. 789, 937 N.W.2d 181 (2020).

[6] *State v. Dean*, 270 Neb. 972, 708 N.W.2d 640 (2006).

[7] *State v. Lotter*, 266 Neb. 758, 669 N.W.2d 438 (2003).

for DNA testing and granted the State's motion to deny DNA testing. As a result, the court also denied Jacob's motion to proceed in forma pauperis and his motion for appointment of counsel.

## MOTION TO ALTER
## OR AMEND

On March 18, 2020, Jacob filed a motion to alter or amend the court's March 11 order. Jacob argued that the court (1) misrepresented the claims contained in his motion for DNA testing and (2) applied an improper standard of law. Jacob reiterated his theories about the night of the murders. In regard to DNA testing on the slugs, Jacob reasserted his argument that because he only kept four cartridges loaded in the gun, and because the police found six shell casings and one unfired cartridge, the person who fired the gun would have had to insert more cartridges, meaning that the DNA of the shooter could be on the slugs found at the crime scene. In regard to DNA testing on the gauze, Jacob stated that the court ignored the fact that the stain could also contain "the DNA of gut bacteria (like E. Coli) found in human feces." Jacob contended such DNA testing could be evidence of nonconsensual sexual intercourse, providing Hopper with a motive to shoot Etherton.

Jacob further argued that the proper legal standard is "the Court must GRANT DNA testing that MAY produce noncumulative exculpatory evidence relevant to the claim that [Jacob] was wrongfully convicted" and argued that the court erred by turning the standard into "the Court must DENY DNA testing that MAY NOT produce noncumulative exculpatory evidence relevant to the claim of wrongful conviction."

Before the court could rule on his motion to alter or amend, Jacob filed a notice of appeal, intending to appeal the March 11, 2020, order and the court's ruling on his pending motion to alter or amend. We dismissed the appeal pursuant to Neb. Ct. R. App. P. § 2-107(B)(1) (rev. 2017). On July 31, Jacob filed

a "Request for Hearing or Ruling" seeking a hearing or ruling on his motion to alter or amend the court's March 11 judgment. On August 3, the district court entered an order deeming Jacob's motion to alter or amend as abandoned for failure to file a notice of hearing and certificate of service and, for purposes of appeal, denied the motion.

## Appeal

On August 13, 2020, Jacob filed another notice of appeal, intending to appeal the March 11 order denying his motion for DNA testing and the August 3 order finding his motion to alter or amend abandoned and therefore denied. On the same day, Jacob filed a praecipe for a bill of exceptions. The praecipe stated the following:

> Please prepare a Bill of Exceptions for the second appeal of this matter to include (some of which you have previously prepared for the first appeal):
>
> 1. The hearing held on November 7, 2019; please include all of the exhibits offered into evidence at that hearing (including the entire record of the two trials in this case; see, p.3., lines 9-18 from the first appeal's Bill of Exceptions);
>
> 2. The hearing held on December 6, 2019; please include all of the exhibits offered into evidence at that hearing.
>
> Please note that other than the request for the reference to the "entire record" in ¶1, above, as meaning the Bill of Exceptions the County Attorney refered [sic] to, this request is the same as you have previously prepared for the appeal of this matter.

On December 1, 2020, Jacob filed a "Motion for Order for Bill of Exceptions," asking this court to order the district court and the court reporter to provide this court with the bill of exceptions to include a complete record of Jacob's second trial. We overruled this motion on December 9, as the bill of exceptions was filed on December 8.

On March 25, 2021, Jacob filed another motion for the bill of exceptions requesting the correct record. Jacob stated that the copy of the bill of exceptions he received listed exhibits 735 to 753, even though the docket sheet showed the current bill of exceptions contained exhibits 735 to 752. Jacob argued the bill of exceptions was altered and requested a copy of the "new or altered Bill of Exceptions." Though the cover page of the bill of exceptions lists exhibits 735 to 752, the actual content of the bill of exceptions includes exhibits 735 to 753. We overruled this motion on April 13.

## ASSIGNMENTS OF ERROR

Jacob assigns, reordered and restated, that the district court (1) abused its discretion by denying his motion for DNA testing, (2) abused its discretion by refusing to appoint him counsel, (3) abused its discretion by denying his motion to alter or amend, and (4) failed to produce the correct bill of exceptions he requested for his appeal.

## STANDARD OF REVIEW

[1,2] A motion for DNA testing is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.[8] An appellate court will uphold a trial court's findings of fact related to a motion for DNA testing unless such findings are clearly erroneous.[9]

[3] Decisions regarding appointment of counsel under the DNA Testing Act are reviewed for an abuse of discretion.[10]

[4] An appellate court reviews a denial of a motion to alter or amend the judgment for an abuse of discretion.[11]

---

[8] *Myers, supra* note 5.

[9] *Id.*

[10] *Id.*

[11] *State v. Amaya*, 298 Neb. 70, 902 N.W.2d 675 (2017).

## ANALYSIS

### Denial of Jacob's Motion for DNA Testing

[5,6] Nebraska's DNA Testing Act is a limited remedy providing inmates an opportunity to obtain DNA testing in order to establish innocence after a conviction.[12] Pursuant to the act, a person in custody takes the first step toward obtaining possible relief by filing a motion in the court that entered the judgment requesting forensic DNA testing of biological material.[13] Section 29-4120(1) provides the parameters for such motion and states:

Notwithstanding any other provision of law, a person in custody pursuant to the judgment of a court may, at any time after conviction, file a motion, with or without supporting affidavits, in the court that entered the judgment requesting forensic DNA testing of any biological material that:

(a) Is related to the investigation or prosecution that resulted in such judgment;

(b) Is in the actual or constructive possession or control of the state or is in the possession or control of others under circumstances likely to safeguard the integrity of the biological material's original physical composition; and

(c) Was not previously subjected to DNA testing or can be subjected to retesting with more current DNA techniques that provide a reasonable likelihood of more accurate and probative results.

We pause at this point to observe there is no dispute that Jacob met these required criteria for filing a § 29-4120(1) motion. If the above criteria are met and if the court further determines that the requirements of § 29-4120(5) have been

---

[12] *Myers, supra* note 5; *State v. Betancourt-Garcia*, 299 Neb. 775, 910 N.W.2d 164 (2018). See § 29-4117.

[13] *Id.*

met, then the court must order testing.[14] Section 29-4120(5) provides:

> Upon consideration of affidavits or after a hearing, the court shall order DNA testing pursuant to a motion filed under subsection (1) of this section upon a determination that (a)(i) the biological material was not previously subjected to DNA testing or (ii) the biological material was tested previously, but current technology could provide a reasonable likelihood of more accurate and probative results, (b) the biological material has been retained under circumstances likely to safeguard the integrity of its original physical composition, and (c) such testing may produce noncumulative, exculpatory evidence relevant to the claim that the person was wrongfully convicted or sentenced.

In the instant case, there is also no dispute that Jacob met the first two criteria for DNA testing under § 29-4120(5). However, the State argued, and the district court agreed, the third requirement, that such DNA testing "may produce noncumulative, exculpatory evidence relevant to the claim that the person was wrongfully convicted or sentenced," had not been met.

[7] The Nebraska Legislature has defined the term "exculpatory evidence" as evidence which is favorable to the person in custody and material to the issue of the guilt of the person in custody.[15] This court has explained that "[t]his requirement is relatively undemanding . . . and will generally preclude testing only where the evidence at issue would have no bearing on the guilt or culpability of the movant."[16] In other words, despite this low threshold, a court is not required to order postconviction DNA testing if such testing would not produce exculpatory evidence.[17]

---

[14] *Myers, supra* note 5.

[15] § 29-4119.

[16] *Myers, supra* note 5, 304 Neb. at 797, 937 N.W.2d at 187. Accord *Buckman, supra* note 4.

[17] See *State v. Ildefonso*, 304 Neb. 711, 936 N.W.2d 348 (2019).

Jacob claims the requested testing on the slugs would show other individuals' DNA on the slugs, which would prove that he was not the shooter. Jacob also claims the requested testing on the gauze would show the presence of someone else's DNA, ultimately giving Hopper a motive to perpetrate a murder-suicide. We agree with the district court's conclusion that even if we were to assume that Jacob's DNA was absent from the items, or that the DNA of Hopper, Etherton, or Ingram were present on those items, such results would not exonerate Jacob from being the person who fired the shots.

[8,9] In *Myers*, we addressed the denial of a request for DNA testing by a defendant convicted of murder.[18] In that case, the defendant requested DNA testing on several items of evidence, including bullet casings, taken from the crime scene and argued that if testing showed the presence of other male DNA, but failed to show the presence of his DNA, he would be proved innocent. We noted that even if the defendant's DNA was not on the tested items, such a result would not prove that the defendant was not at the crime scene, nor would it prove that he did not commit the crimes.[19] Thus, the nonpresence of an individual's DNA profile in a biological sample does not preclude that individual from having been present or in possession of the item tested.[20] Instead, such results would merely show the individual's DNA was not present in the specific biological sample tested.[21] In affirming the district court's denial, we explained that it would be speculation to prove the defendant did not commit the crime merely because the DNA testing would show the defendant's DNA was not present on the items in the victim's apartment, or on the gun and ammunition used in the crime.[22] We concluded

---

[18] *Myers, supra* note 5.

[19] See *id*.

[20] *Id.*

[21] *Id.*

[22] See *id*.

this was so, particularly in view of the persuasive evidence of the defendant's presence at the apartment and possession of the gun the night of the murder.[23]

Likewise, in *Dean*, the defendant argued that the testing of a firearm and ammunition used in the commission of a murder would not produce any biological material associated with him.[24] The defendant then extrapolated that someone else's DNA on the items would prove he was not the shooter.[25] We held that "even if [the defendant] is correct and DNA testing would not detect the presence of his DNA on the objects in question, the result would be at best inconclusive, and certainly not exculpatory."[26] We concluded that in light of the other evidence offered at trial, the district court's denial of DNA testing was not an abuse of discretion.[27]

[10] Additionally, in *Lotter*, we affirmed the denial of the defendant's request for DNA testing following his murder convictions.[28] In *Lotter*, the defendant claimed that blood spatter from the victims on an accomplice's gloves, shoes, or clothing would establish that the accomplice was very close to the victims when they were shot and that the accomplice was not at the locations he described in his trial testimony. The defendant contended that such DNA test results would aid in establishing that the accomplice lied at trial and would prove that the accomplice shot all three victims.[29] We concluded that the accomplice's testimony would not have been contradicted even if the defendant's claims that testing would show the victims' blood on the accomplice's clothes were correct.[30] In *Lotter*, we

---

[23] *Id.*

[24] *Dean, supra* note 6.

[25] See *id.*

[26] *Id.* at 976, 708 N.W.2d at 644.

[27] See *Dean, supra* note 6.

[28] *Lotter, supra* note 7.

[29] See *id.*

[30] See *id.*

explained that DNA evidence is not a videotape of a crime and that testing only shows whether the blood in question belonged to the person tested against. Because other evidence received was consistent with the alleged presence of the victims' blood on the accomplice's clothes and because testing would have only established whether the blood belonged to one or more of the victims, not how it was deposited on each item, we found it would be mere speculation to conclude that blood was on the accomplice's clothing because he was the shooter.[31] We held in *Lotter* that such testing could not establish noncumulative, exculpatory evidence relevant to the defendant's claim that he was wrongfully convicted or sentenced.

Similar to the situations in *Myers* and *Dean*, the other evidence received during Jacob's trial contradicts his underlying theory that he was not at the house and did not possess the gun used in the murders of Hopper and Etherton.[32] Hopper's work supervisor testified that the day before the murders, Hopper told him that Jacob wanted to talk to her and that if she would not do that, he might do something drastic. When officers arrived at the crime scene, they discovered that the basement screen door had been propped open with a rock and that the glass on the inner door was broken out. They also observed that someone had removed a storm window from a window next to the basement door, which window was later found to contain Jacob's fingerprints. Additionally, a firearms examiner testified that all the casings found at the crime scene were from 9-mm bullets fired from the same weapon. Both Jacob and Jacob's father testified that Jacob owned a 9-mm pistol. Ingram testified that on the night of the murders, while he waited for police to arrive, he saw a car slowly drive by and described the driver as having a receding hairline, glasses, a mustache, and dark hair. He testified that he later recognized the driver as Jacob after seeing Jacob's picture on the news the

[31] See *id.*

[32] See, *Myers, supra* note 5; *Dean, supra* note 6.

next day. At trial, Ingram identified Jacob as the driver of the vehicle. Faulkerson testified that while sharing a cellblock with Jacob, Jacob stated that he "was not going to end up doing a minute on his time . . . because he didn't leave any witnesses." Faulkerson also testified that Jacob told him, "I shot him first so the bitch could see what she had coming." This other evidence of Jacob's guilt is overwhelming.

Jacob's argument that testing will produce results which contradict the evidence presented at trial and show he was not present at Etherton's house is not persuasive. As we have said, DNA evidence is not a videotape of a crime, and the nonpresence of an individual's DNA profile in a biological sample does not preclude that individual from having been present or in possession of the item tested. Instead, such results would merely show that Jacob's DNA was not present in the specific biological sample tested.[33] It would be mere speculation to conclude that the presence of Etherton's, Hopper's, or Ingram's DNA on the slugs or the stain found in the living room would exclude Jacob from having been at Etherton's house the night of the shooting or from having been the shooter.

Because the requested testing would fail to lead to noncumulative exculpatory evidence as determined above, the district court did not err in finding his request for DNA testing did not meet the requirements of § 29-4120(5)(c) and in denying Jacob's motion. This assignment of error is without merit.

Declining to Appoint Counsel

Under the DNA Testing Act, a court shall appoint counsel for an indigent person upon a showing that DNA testing may be relevant to the person's claim of wrongful conviction.[34] In similar cases where we affirmed findings that the requested testing would not produce noncumulative exculpatory evidence, we applied that finding to determine the applicants

---

[33] See *Myers, supra* note 5.

[34] § 29-4122.

failed to show the DNA testing was relevant to the wrongful conviction claims.[35] Therefore, for the reasons discussed above, Jacob did not make the requisite showing that DNA testing may be relevant to his claim of wrongful conviction, and thus, the district court did not abuse its discretion in denying his request for appointment of counsel. This assignment of error is without merit.

## Motion to Alter or Amend

Jacob argues the district court erred in denying his motion to alter or amend and in failing to consider the issues he raised in his motion. The court rule in the district court for Lancaster County, Nebraska, states:

> When any motion requiring a hearing is filed, it shall be filed with a notice of hearing with a date, time, manner of hearing, and certificate of service with the Clerk of the District Court (Clerk) not less than 5 days prior to hearing, except by permission of the court.[36]

In the instant matter, Jacob's motion to alter or amend was filed without a notice of hearing with a date, time, and manner of hearing. Further, the district court's order denying the motion clearly indicates the motion was deemed abandoned for failure to comply with the court's rules and was denied.

Jacob argues that the court rule does not apply because his motion to alter or amend did not *require* a hearing. We have previously recognized that the description of a motion to alter or amend in Neb. Rev. Stat. § 25-1329 (Reissue 2016) does not include any requirement that the motion be accompanied simultaneously by a notice of hearing before the district court.[37] We have also cautioned that any applicable rules concerning motions should be followed.[38] In arguing that his

---

[35] See, *Myers, supra* note 5; *Dean, supra* note 6.

[36] Rules of Dist. Ct. of Third Jud. Dist. 3-2(A) (rev. 2019).

[37] See *Lombardo v. Sedlacek*, 299 Neb. 400, 908 N.W.2d 630 (2018).

[38] See *Bryson L. v. Izabella L.*, 302 Neb. 145, 921 N.W.2d 829 (2019).

motion does not require a hearing, Jacob points out that the motion made legal arguments and that he did not offer new evidence. His motion asked the court to amend its order to require DNA testing.

Assuming, without deciding, that the district court erred in deeming the motion to be abandoned, Jacob has not been deprived of a substantial right. Contrary to the assertion in Jacob's brief, he has not been deprived of his right to appeal. The district court's ruling, though not on the merits, had the effect of denying Jacob's motion to alter or amend—a motion that challenged the correctness of the denial of his motion for DNA testing. And as set forth above, we have concluded that the district court did not err in denying Jacob's motion for DNA testing.

### Bill of Exceptions

Jacob alleges the district court failed to produce and file the bill of exceptions he requested. Specifically, Jacob argues that had the bill of exceptions been filed, it would have shown that upon the State's request, the district court took judicial notice of the entire record of the second trial without receiving it as an exhibit.

Our record, however, indicates that the bill of exceptions was filed on December 8, 2020. The filed bill of exceptions contained the transcript of the two hearings on Jacob's motion for DNA testing and the exhibits offered at those hearings. Additionally, the record indicates that the State did not ask the court to take judicial notice of the records of Jacob's previous trials, nor did the district court take judicial notice of those previous trials.

Despite Jacob's erroneous arguments, we note that a bill of exceptions was prepared for both Jacob's first and second trials and that both bills of exceptions were relied upon by this court on Jacob's earlier appeals. As such, those records remain part of this case and remain available for future review.[39] As

---

[39] See *State v. Myers*, 301 Neb. 756, 919 N.W.2d 893 (2018).

a result, Jacob's praecipe for a bill of exceptions requesting preparation of the entire record of the second trial was unnecessary as were his motions for orders of bills of exceptions. This assignment of error is without merit.

## CONCLUSION

The DNA testing requested by Jacob would not result in noncumulative exculpatory evidence relevant to his wrongful conviction claim. We therefore affirm the district court's denial of Jacob's motion for DNA testing, motion for appointment of counsel, and motion to alter or amend.

Affirmed.

Heavican, C.J., and Stacy and Freudenberg, JJ., not participating.